CLOVERFIELDS IMPROVEMENT ASSOC., INC. ET AL. *v.* SEABREEZE PROPERTIES, INC.

[No. 1142, September Term, 1975.]

*Decided July 28, 1976.*

The cause was argued before GILBERT, C. J., and MOYLAN, DAVIDSON, and LOWE, JJ.

*John W. Sause, Jr.* for appellants.

*Irwin M. Sussman* for appellee.

GILBERT, C. J., delivered the opinion of the Court.

Cloverfields Improvement Association, Inc. (Association), one of the appellants,[1] and Seabreeze Properties, Inc. (Seabreeze), the appellee, both claim ownership by separate recorded documents to the same property. Association here contends the assignment to it vests it with title, while Seabreeze avers the deed it received some six (6) years later is the valid document.

In order to assert its ownership, Association filed a petition for a declaratory decree in the Circuit Court for Queen Anne's County. Following an answer by Seabreeze,

---

1. There are also two individual appellants, Nelson Malley and Mary Malley, his wife. For convenience, we shall, in this appeal, refer to all appellants collectively as "Association."

the matter was submitted on stipulated facts to Judge B. Hackett Turner. The trial judge decreed that Association's assignment was a nullity, that Seabreeze was the owner of the property that Association claimed, and that Association was required to account to Seabreeze for certain monies collected by Association under the mistaken belief that they were so entitled.

Before undertaking to discuss the issues presented, we shall set the scene.

In 1959, David M. Nichols was a real estate developer actively engaged in Queen Anne's County. Among the developments undertaken by Nichols, through a corporation named Guaranteed Realty Corporation (Guaranteed), was a 337 acre area known as "Cloverfields," located on the Chester River, Kent Island. The lots sold by Guaranteed were subject to certain restrictions, covenants, and agreements. By the terms of one clause thereof, a buyer agreed to pay to Guaranteed or its successor ". . . a sum not to exceed Twenty Dollars ($20.00) per year . . ." for each lot purchased. Guaranteed agreed that it or its successor would form ". . . an association of the Purchasers and Owners of the lots . . ." for the express "purpose of taking title to and operating the recreational facilities." Each purchaser/lot owner covenanted to "maintain membership" in the Association and to abide by its rules and regulations. Guaranteed reserved unto itself the right to manage, supervise, and control all the facilities, "recreational and otherwise," until seventy-five percent (75%) of the lots in the development had been sold. In the same year, 1959, Guaranteed conveyed the recreational facilities unto a Cloverfields Club, Inc. (Club), a corporation formed by Nichols apparently for the purpose of operating the recreational facilities.

By proclamation of the Governor of Maryland, the corporate charters of Guaranteed and Club were declared to be annulled on December 2, 1964, for nonpayment of taxes and failure to file an annual report.[2] We infer that both

2. Such forfeiture was authorized at that time by Md. Ann. Code art. 81, § 204 (a). The statutory language in substantially the same form now appears in Md. Ann. Code, Corporations and Associations Art., § 3-503.

Guaranteed and Club failed to pay their respective annual franchise taxes.

Notwithstanding the forfeiture of their charters, Guaranteed and Club purported to assign to Association, in April, 1965, ". . . all right, title, estate and interest in and to the annual maintenance fee established, set forth, and imposed on each of said lots . . . ." Also, in April, 1965, Guaranteed deeded certain road ways to Association. Earlier in time, *i.e.*, in November of 1962, Club had assigned its right, title, and interest in the operation and maintenance of a club and recreational facilities to Association.

Thereafter, Association, seemingly in reliance upon the purported assignments from Guaranteed and Club, collected the twenty dollar ($20.00) annual lot assessment charge and operated the recreational facilities. Association later discovered that Seabreeze had purchased from Olive J. Nichols and Catherine C. Wallman, "the Surviving Directors" of Guaranteed and Club, on July 2, 1971, all the remaining unsold lots in the development and, at the same time, had acquired from the surviving trustees the rights to collect the twenty dollar ($20.00) assessment and to operate the recreational facilities. From the record, we glean that Seabreeze made demand upon the lot owners for the remittance of the annual fee. Association then brought its declaratory action. While the suit was pending, the corporate charters of Guaranteed and Club were revived on December 10, 1973, by filing "Articles of Revival" with the State Department of Assessments and Taxation of Maryland.

## THE APRIL 1965 DEED AND ASSIGNMENT

The deed and assignment from Guaranteed to Association occurred approximately four (4) months after Guaranteed's corporate charter had been declared forfeited. What then was the effect of the assignment? According to H. Brune, *Maryland Corporation Law and Practice*, § 406 (rev. ed. 1953) [hereinafter referred to as Brune]:

> "The forfeiture for non-payment of taxes puts an
> end to the corporate existence, and the rights of

creditors become fixed at that time. The corporate assets are automatically transferred to the directors, as trustees, for use of the creditors and stockholders or members, and are held by such trustees until revival of the charter of the corporation. The directors as trustees do not incur a landowner's liability as to property, *title to which was no longer in the corporation at the time of forfeiture.* " (Footnotes omitted). (Emphasis added).

The Court of Appeals does not appear to have passed directly upon the situation presented by the unique facts of the case now before us, but, from two of its decisions, we are able to perceive what we believe would be its holding. In *Atlantic Mill & Lumber Realty Co. v. Keefer,* 179 Md. 496, 499-500, 20 A. 2d 178, 180 (1941), the Court said that all power which had been granted to a corporation whose charter is forfeited is ". . . inoperative, null and void. This organization . . . is not legally in existence as a corporation and cannot function as a corporation." The Court stated in *Callahan v. Clemens,* 184 Md. 520, 528, 41 A. 2d 473, 476 (1945), that forfeiture puts ". . . an end to the corporate existence." Patently, if the corporate existence terminates upon forfeiture, and the assets are *ipso facto* transferred to the directors, as trustees, then the corporate officers, as officers, are devoid of authority to act for the corporation. A corporation is a creature of the State. It owes its very being to the State. "Into its nostrils the State must breathe the breath of a fictitious life for otherwise it would be no animated body but individualistic dust." [3] Once a corporation has been allowed to cease breathing, as through forfeiture, articles of revival [4] are the only resuscitation available to generate life in the corporate body.

We hold that, inasmuch as the charters of Guaranteed and Club had been forfeited, the purported postforfeiture

---

**3.** F. Maitland, *Introduction* to O. Gierke, *Political Theories of the Middle Ages* at xxx (1900).

**4.** Articles of revival were then authorized by Md. Ann. Code art. 23, § 85. Such a procedure is now codified in Corporations and Associations Art., § 3-508.

corporate deed and assignment to Association, by David Nichols as president of Guaranteed and Club, were nullities and consequently of no force and effect.

### THE MANNER OF EXECUTION OF THE APRIL 24, 1965 DEED AND ASSIGNMENT AS AFFECTING THEIR VALIDITY

Association, cognizant of the weakness of its position as a result of the postforfeiture corporate act, asserts that even if the corporate deed and assignment are nullities, the officers, David M. Nichols, president, and Catherine C. Wallman, secretary, should be held to have executed both the deed and the assignment in the capacity of surviving trustees of the defunct corporation. To bolster its position, Association relies principally upon *Philbin v. Thurn ex rel. Cook*, 103 Md. 342, 63 A. 571 (1906); *State ex rel. Gable v. Cheston*, 51 Md. 352 (1879); and *Flickinger v. Hull*, 5 Gill 60 (1847).

*Philbin* involved a deed made by executors, who had, by a will, been named as testamentary trustees. Under the will, the executors had no power of sale, but the trustees were cloaked with that authority. The trustees signed a deed as executors, which signing was shown to be inadvertent. Later they executed a confirmatory deed. The Court, in answer to an attack upon the first deed by a creditor, opined that where a party in possession of property has several capacities and disposes of the property in one of those capacities, the law will attribute to his disposition the proper capacity even though he does not profess to exercise it.

*Cheston* was concerned with a deed made by executors, who, as in *Philbin*, were also trustees. The executors were empowered to sell, but not to purchase. The trustees, on the other hand, could do both. As "executors," the trustees bought and sold a certain property. When their action was assailed by litigation, the Court took the view that the deed was proper in that the law will attribute the correct authority to the act irrespective of the fact that the trustees erroneously called themselves "executors" at the time of conveyancing.

Both *Philbin* and *Cheston* were grounded on the early holding in *Flickinger*, wherein the Court stated:

"... [W]here a man has several capacities, and is found in possession of property, the law will attach the possession to the capacity in which, of right, it ought to be held; so also, where having various capacities, he executes an authority delegated to him in one of those capacities, the law will attribute the act to the proper authority, although the person does not profess to exercise it, in virtue of that particular power." 5 Gill at 74-75.

One fallacy in Association's endeavor to apply the reasoning of *Philbin, Cheston,* and *Flickinger* lies in the fact that, in each of those three cases, the persons who executed the instruments which were the subject of litigation simultaneously exercised two distinct capacities or the signing in the wrong capacity was shown to be inadvertent. In the instant case, such is not the situation.

Nichols was not the president of the two corporations, Guaranteed or Club, at the time he subscribed the deed and assignment because there were no such corporations *in esse.* If there were no such corporations, then there could be neither a corporate president nor a corporate secretary. *Ergo,* when Nichols executed the deed and assignment, he could not have done so in a dual capacity, *i.e.,* president and trustee, because he was no longer corporate president.

Moreover, it cannot be contended successfully that Nichols signed the deed and the assignment in the capacity of surviving trustee. It is manifest from the executed documents that Nichols signed as corporate president. His identification as such is beyond question. Having signed as president, having had his signature as president attested and witnessed as such, and having acknowledged both the deed and assignment as corporate president, we would be hard pressed to hold, as Association would have us do, that Nichols was really signing in the capacity of surviving trustee. Evidence of inadvertent signing under color of the wrong office is simply not present.

There is yet a more compelling reason why the April, 1965 deed and assignment are invalid. The law of Maryland is clear that, in order for surviving trustees of an extinct corporation to pass title to what were corporate assets, the majority of the surviving trustees must act to do so. Former Md. Ann. Code art. 23, § 78 [5] provided:

"(a) *Directors become trustees of assets until appointment of receiver.* — Upon dissolution of any corporation of this State, and unless and until one or more receivers of the property and assets of the corporation have been appointed by a court of competent jurisdiction, the directors shall become and be, for purposes of liquidation, trustees of the property and assets of the corporation so dissolved.

(b) *Powers of directors as trustees.* — In the liquidation of the corporation and the winding up of its affairs, such trustees shall, until a receiver is appointed by such court, be vested, in their capacity as trustees, with full title to all the property and assets of the corporation. They shall proceed to collect and distribute the assets of the corporation, applying such assets to the extent available to the payment, satisfaction and discharge of existing debts and obligations of the corporation, including necessary expenses of liquidation, and distributing the remaining assets among the stockholders. They shall have power to carry out the contracts of the corporation; they may sell all or any part of the assets of the corporation at public or private sale; they may sue or be sued in their own names as trustees, or, notwithstanding such dissolution, in the name of the corporation; and they shall have power to do all other acts and things consistent with law and the charter of the corporation, necessary or appropriate to carry into effect the liquidation of the corporation and the winding up of its affairs. The will of a majority of the trustees shall govern."

5. Now Corporations and Associations Art., § 3-410.

We observe that both the deed and the assignment were executed as follows: [6]

As to the deed:

"WITNESS:         GUARANTEED REALTY CORPORATION

S/ _Edith H. Theraux_    By: S/ _David M. Nichols_
                                President

ATTEST:

S/ _Catherine C. Wallman_      (Place Corporate Seal Here)
     Secretary                         (SEAL)

+ + +

STATE OF MARYLAND

CITY OR COUNTY OF ____ _Baltimore_ ____ , TO WIT:

I HEREBY CERTIFY that on this __15th__ day of __April__ , 1965, before me, the subscriber, a Notary Public of the State of Maryland, in and for the County or City aforesaid, personally appeared __David M. Nichols__ , President of Guaranteed Realty Corporation, a body corporate of the State of Maryland, and he did acknowledge the aforegoing Deed to the act of said body corporate.

WITNESS my hand and Notarial Seal.    (SEAL)

S/ _Edith H. Theraux_
           Notary Public
           My Commission Expires: 5/3/65"

---

6. The deed was also signed and acknowledged by the receiver for the mortgagee of Guaranteed and by the trustee in bankruptcy. Neither signatory nor acknowledgment is of significance to this opinion. The trustee in bankruptcy subscribed the assignment, and his acknowledgment before a notary is part of the document. Association, through its then president, also signed and acknowledged the assignment.

As to the assignment:

"WITNESS:   GUARANTEED REALTY CORPORATION

S/ *Edith H. Theraux*  By: Ṡ/ *David M. Nichols*
            President

ATTEST:     (PLACE CORPORATE SEAL HERE)

S/ *Catherine C. Wallman*    (SEAL)

WITNESS:    CLOVERFIELDS CLUB, INC.

S/ *Edith H. Theraux*  By: S/ *David M. Nichols*
            President

ATTEST:     (PLACE CORPORATE SEAL HERE)

S/ *Catherine C. Wallman*    (SEAL)
 Secretary

+ + +

STATE OF MARYLAND

CITY OR COUNTY OF  *Baltimore*  TO WIT:

  On this *15th* day of *April* , 1965, before me, *a Notary Public* , the undersigned, personally appeared *David M. Nichols* , who acknowledged himself to be the_____President of Guaranteed Realty Corporation, a body corporate of the State of Maryland, and that he, as such_____ President, being authorized so to do, executed the aforegoing instrument for the purposes therein contained by signing the name of the corporation by himself as_____President.

  IN WITNESS WHEREOF, I hereunto set my hand and official seal.

   (SEAL)   S/ *Edith H. Theraux*
          Notary Public
          My Commission Expires: 5/3/65

STATE OF MARYLAND

CITY OR COUNTY OF ___*City of Baltimore*___ TO WIT:

On this __*15th*__ day of __*April*__ , 1965, before me,__ *a Notary Public*___ , the undersigned, personally appeared__ *David M. Nichols*___ , who acknowledged himself to be the____President of Cloverfields Club, Inc., a body corporate of the State of Maryland, and that he, as such____ President, being authorized so to do, executed the aforegoing instrument for the purposes therein contained by signing the name of the corporation by himself as____President.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

(SEAL)      S/ . *Edith H. Theraux*
                     Notary Public
                     My Commission Expires:      "

It is immediately apparent that Catherine C. Wallman did not sign the deed in any capacity but merely attested to the signature of Nichols, and inferentially she affixed the corporate seal. Only Nichols' signature was witnessed, and only he acknowledged the deed and the assignment.

Under the law of this State, a deed is required to be executed and acknowledged. Md. Ann. Code art. 21, § 4-101, (now codified as Real Property Art., § 4-101 (a)). Thus, even if Wallman's signature attesting to the "corporate act" were determined to be an execution of the deed, there was no acknowledgment by her. Hence, the deed would be defective,[7] absent the curative act. Md. Laws ch. 228 (1967).

The word "attest," according to *Black's Law Dictionary* 166 (3d ed. 1933), means "[t]o bear witness to; to affirm to be

---

7. Some of the legislative reasons for requiring an acknowledgment are to protect the property owner from coerced deeds, sham conveyances which would cloud titles, and to assure, insofar as possible, the validity of the land records.

true or genuine. . . . To witness the execution of a written instrument, at the request of him who makes it, and subscribe the same as a witness. *White v. Magarahan,* 87 Ga. 217, 13 S. E. 509 [(1891)]; *Logwood v. Hussey,* 60 Ala. [417 (1877)]; *Arrington v. Arrington,* 122 Ala. 510, 26 So. 152 [(1899)]." We think it beyond serious question that the signature of Catherine C. Wallman did no more than bear witness to the signature of David M. Nichols to the deed as well as to the assignment.

Ordinarily the duties of corporate officers are spelled out in the by-laws, *Brune* § 232, or by resolution of the board of directors. Md. Ann. Code, Corporations and Associations Art., § 2-414 (a)(1) and (2). Generally, a corporate secretary is not authorized to act in an executive capacity so as to bind the corporation to contracts. Nor has a secretary the authority to appoint agents. The corporate secretary is usually the keeper of the corporate seal. *Brune* § 232.

In any event, we believe it unmistakable that Wallman executed neither the deed nor the assignment as surviving trustee, but rather for the sole and limited purpose of witnessing what she ostensibly felt to be the corporate act of Nichols as president of both Guaranteed and Club.

We hold that Nichols and Wallman did not sign the 1965 deed or the 1965 assignment as surviving trustees, and, therefore, the 1965 instruments are invalid. *See New Hampshire Fire Insurance Co. v. Virgil & Frank's Locker Service, Inc.,* 302 F. 2d 780 (8th Cir. 1962).

## THE SURVIVING TRUSTEES DEED OF JULY, 1971

We have already seen that, when a corporate charter has been forfeited, the directors of the terminated corporation hold the assets of the corporation as trustees for the benefit of creditors and stockholders. In the case at bar, the surviving trustees [8] were, in 1971, empowered to "sell all or any part of the assets of the corporation at public or private sale." Md. Ann. Code art. 23, § 78 (b).[9] Pursuant to the

---

**8.** David M. Nichols died shortly after the 1965 transactions had been completed.

**9.** Now Corporations and Associations Art., § 3-410 (c) (2).

authority conferred upon them by statute, Olive J. Nichols and Catherine C. Wallman, as surviving trustees of both Guaranteed and Club, bargained and sold, to Seabreeze, "all remaining lots" and the ". . . remaining strips of land, or roads, roadways, streets, alleys, walks or lanes . . . ." At the same time, and in the same instrument, the trustees assigned to Seabreeze ". . . the right to collect the annual lot charges . . . ," the nub of this case, as well as the ". . . right to approve and disapprove all construction, plans and specifications . . ." on any structure to be built within the development.

The combination deed and assignment to Seabreeze acknowledged that Guaranteed and Club had endeavored to convey and assign the same property, except the remaining lots, to Association, but the document referred to the paper writings executed in 1965 by Guaranteed and Club as "defective."

The assignment and deed were executed by the surviving trustees in accordance with the applicable law.[10] Judge Turner concluded, and we agree, that the deed and assignment were valid and did vest title to the remaining lots, streets, roadways, walks, alleys, and lanes in Seabreeze. Simultaneously, for the reasons stated, *infra,* Seabreeze acquired the rights to collect the annual lot charge of twenty dollars ($20.00) and to approve, prior to construction, building plans.

## THE EFFECT OF THE ARTICLES OF REVIVAL ON THE 1965 DEED AND ASSIGNMENT

Then Md. Ann. Code art. 23, § 85 (d) [11] provided:

". . . [R]evival of the charter of the corporation shall validate all contracts, acts, matters and things made, done and performed within the scope of its charter by the corporation, its officers and agents during the time when the charter was void, with the same force and effect and to all intents and

---

10. *Supra* note 9.
11. Substantially the same language is now found in Corporations and Associations Art., § 3-513.

purposes as if the charter had at all times remained in full force and effect. All real and personal property, rights and credits of the corporation at the time its charter became void and of which it was not divested prior to such revival shall be vested in the corporation, after such revival, as fully as they were held by the corporation at the time its charter became void. The corporation after such revival shall be liable for all contracts, acts, matters and things made, done or performed in its name and on its behalf by its officers and agents prior to such revival as if its charter had at all times remained in full force and effect."

Association, as we have previously noted, in an attempt to validate the April, 1965 deed and assignment, caused "Articles of Revival" to be filed on behalf of Guaranteed and Club.[12] The Articles were filed while this instant suit was pending before the circuit court in 1973. Having successfully revitalized the two extinct corporations, Association then took the tack that the conveyance and assignment of 1965, even if defective when made, were cured by the revival of viable corporate status under § 85 (d). That simplistic approach ignores that sentence of § 85 (d) which states:

"All real and personal property, rights and credits of the corporation at the time its charter became void *and of which it was not divested prior to such revival* shall be vested in the corporation, after such revival, as fully as they were held by the corporation at the time its charter became void." (Emphasis added).

We think former § 85 (d) to be clear and unambiguous in that the revived corporation may only take title to those assets which were legally not disposed of during the period of corporate demise. Inasmuch as the surviving trustees had,

---

12. Interestingly, "... Olive J. Nichols and Catherine C. Wallman, as surviving officers of Guarantee and ... Club filed Articles of Revival for each corporation ...." The reason for their action in so doing is not explained in the record.

in 1971, validly conveyed and assigned the very property Association thought it had acquired in 1965, the total effect of the revival in this case is naught. The act of revival cannot divest a *bona fide* purchaser of his title.

### TITLE TO THE CLUBHOUSE AND BOAT BASIN, AND THE RIGHT TO COLLECT THE ANNUAL MAINTENANCE FEE

By deed dated December 11, 1959, Guaranteed conveyed to Club two (2) parcels of grounds. One was the clubhouse area and the other was the boat basin. The deed, however, did not purport to assign to Club the right to collect the twenty dollar ($20.00) annual fee per lot. Club took title to the land only.

Subsequently, Guaranteed and Club, on September 19, 1961, conveyed to what appears to have been another Nichols corporation, G. Bently Bell and Associates, Inc. (Bell), title to the clubhouse and boat basin. Club reserved ". . . unto itself the right to operate and maintain . . . [the clubhouse] facilities and to collect the maintenance fee provided for such purposes by the terms of said restrictive covenants." We observe, as did Judge Turner, that Club reserved a right "unto itself" that it had never acquired in the first instance. At the expense of repetition, we point out that the deed to Club from Guaranteed did not purport to assign to Club the right to collect the maintenance fee. Club was without authority unilaterally to enforce a right that was still in Guaranteed.

By assignment dated November 3, 1962, Club transferred to Association ". . . all of its right, title, interest and estate in the operation and maintenance of the club[house] and recreational facilities . . ." and the right to collect the annual fee. Of course, Club, having earlier divested itself of legal title to the land and having never acquired the authority to collect the annual fee, in actuality assigned to Association absolutely nothing because it, at that time, possessed nothing.

Bell, as we have seen, acquired title to the clubhouse and

boat basin as a result of a deed from Guaranteed and Club. Through a deed in March, 1965, Bell conveyed its title to Association. The validity of that deed is not in question. Thus, Association owns the recreational facility known as the clubhouse and the boat basin, but they did not acquire, by virtue of that ownership, the right to collect the annual fee.

We are cognizant of the anomaly that has been created by the imprudent conveyancing conducted in this case. The Association, which now owns the clubhouse and boat basin, has no right to collect the annual fee for the maintenance of those facilities. Seabreeze, which has the power to collect the twenty dollar ($20.00) per lot annual charge for the purpose of maintaining the recreational facilities, does not own the facilities.[13] The situation is peculiar, but it has been created by the parties, not by the courts. The solution to the unusual situation in which the parties find themselves rests within their own powers to resolve. It is not for this Court, under the guise of judicial fiat, to loose the fetters with which the litigants have voluntarily bound themselves.

Additionally, Seabreeze has moved to supplement the record so as to incorporate facts not presented to the trial judge. Those facts, not having been before him, are not properly part of the record, and we refuse to consider them. It follows that the motion is denied.

*Judgment affirmed.*
*Costs to be paid by appellants.*

---

**13.** A possible trust situation arises from such an arrangement, but as that matter is not before us, we express no opinion thereon.