CLOVERFIELDS IMPROVEMENT ASSOCIATION, INC.
ET AL. *v.* SEABREEZE PROPERTIES, INC.

[No. 114, September Term, 1976.]

*Decided June 3, 1977.*

*Motion for reconsideration filed June 27, 1977; denied July 14, 1977, see per curiam at page 400 infra.*

*Motion for reconsideration filed by appellee July 21, 1977; denied September 6, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*John W. Sause, Jr.,* for appellants.

*Irwin M. Sussman,* with whom were *Sussman & Hirsh, P.A.* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

The central issue in this case is whether appellant, Cloverfields Improvement Association, Inc. (Cloverfields), or appellee, Seabreeze Properties, Inc. (Seabreeze), is the party entitled to approve the type and character of buildings and to enforce certain subdivision regulations in a Kent Island development. In order to decide that issue we must determine which has priority, a deed executed by a corporation whose charter had been revoked but which

corporation was revived after the institution of these proceedings or a deed from the surviving directors of the corporation, as its trustees, which was executed prior to the revival, under which deed Seabreeze claimed. We conclude that the latter must prevail.

The case was tried in the Circuit Court for Queen Anne's County upon a stipulation of facts, fully detailed by Chief Judge Gilbert for the Court of Special Appeals in *Cloverfields Imp. v. Seabreeze Prop.*, 32 Md. App. 421, 362 A. 2d 675 (1976). We shall set forth only such facts here as are necessary to a clear understanding of the issues.

Had the first Chesapeake Bay Bridge never been built and opened in 1952 this case might not have arisen. The improved communication between the Eastern Shore and the Western Shore provided by that bridge sparked extensive development on Kent Island since travel time between it and the Baltimore and Washington metropolitan areas was substantially reduced. One of the prime movers in that direction was the late David M. Nichols who was involved in a number of subdivisions.[1] Nichols created restrictions applicable to the development he called "Cloverfields" (henceforth referred to as "the development").[2]

Title to the development was in Guaranteed Realty Corporation (Guaranteed), about which more will be said. The restrictions may be divided into three classes:

1 — Regulation of the character of the subdivision and the use of residential lots. All but three paragraphs of the restrictions deal with these matters. The most significant here are those which require approval by Guaranteed of the type and character of any construction.

2 — The right on the part of Guaranteed "in its absolute discretion at any time to annul, waive, change or modify any of the restrictions, covenants, conditions,

---

1. Litigation relative to two of them, Harbor View and Chesapeake Estates, reached this Court in Harbor View Imp. Ass'n v. Downey, 270 Md. 365, 311 A. 2d 422 (1973), and Chesapeake Estates v. Foster, 265 Md. 120, 288 A. 2d 329 (1972), respectively.

2. Counsel for Seabreeze says that the restrictions are the same as those in Matthews v. Kernewood, Inc., 184 Md. 297, 40 A. 2d 522 (1945).

> agreements or provisions . . . as to any part of said tract then owned . . . ."

3 — Imposition of a charge of not more than $20 upon all residential lots in Cloverfields "to be used for the management, supervision, and maintenance [of] the recreational facilities at [the development]."

Seabreeze indicated at argument that it owns the majority of the lots in the development. Cloverfields, as the name would imply, is an improvement association set up by the lot owners in the development.

In due season Cloverfields became vested with title to all of the recreational area in the development. On December 2, 1964, the charter of Guaranteed was declared by the Governor to be "repealed, annulled and forfeited" pursuant to the provisions of Maryland Code (1957, 1964 Cum. Supp.) Art. 81, § 204 (a) for failing to file its annual report and pay its annual franchise taxes.[3] Notwithstanding this fact, on April 24, 1965, Guaranteed and others executed an instrument which assigned to Cloverfields the right to collect and disburse the annual maintenance fee and "all management, supervision and control of all the facilities at Cloverfields, recreational or otherwise" as might have been previously vested in the grantors in that instrument. The instrument is possibly subject to an interpretation that the right to approve buildings, etc., was also so assigned. Two days later yet another instrument was executed by Guaranteed and others (but not the same parties) in which all of the "strips of land, or roads, roadways, streets, alleys, walks or lanes used, or entitled to be used by the owners of lands in the subdivision known as 'Cloverfields' " were conveyed to Cloverfields. Each instrument was executed by Nichols as president, witnessed by a notary who took his acknowledgement as president of Guaranteed, and attested by Catherine C. Wallman as secretary of Guaranteed. It was stipulated by the parties that Nichols, his wife, and Mrs. Wallman were the officers and directors of the corporation

---

3. This section is now found in Code (1975) §§ 3-503 to 504 Corporations and Associations Article.

at the time the charter was declared forfeited. Nichols died on November 19, 1965.

Seabreeze obtained title to a substantial part of the land in the development on May 12, 1971. On July 2 of that year Mrs. Nichols and Mrs. Wallman, as surviving directors of Guaranteed and as "trustees of [its] property and assets," conveyed to Seabreeze all of the strips of land, roads, etc., in the development and assigned to Seabreeze the right of approving construction, etc., as originally held by Guaranteed, together with the right to collect the lot charge.

On March 5, 1973, Cloverfields and a lot owner filed a bill for a declaratory judgment against Seabreeze. The relief sought included a declaration as to which of the parties was entitled to enforce the restrictive covenants and which was entitled to collect the annual lot assessment. On December 10, 1973, at the request of Cloverfields, Mrs. Nichols and Mrs. Wallman executed and filed articles of revival for Guaranteed.

The chancellor (Turner, J.) filed a comprehensive and well reasoned opinion in which he concluded that Seabreeze was entitled to enforce the restrictive covenants and to collect the annual lot assessment. The Court of Special Appeals affirmed.

The arguments of Cloverfields may be summarized as: (1) the directors of Guaranteed under the facts of this case were not vested with power as trustees to convey; (2) the revival of the corporation gave life to the deed executed by Guaranteed after its character was revoked; (3) since the 1965 deed was actually signed by a majority of Guaranteed's directors, Mr. Nichols was president and Mrs. Wallman in attestation, this became a valid deed; (4) Seabreeze could not be a bona fide purchaser for value in the face of the conveyance from Guaranteed to Cloverfields; and (5) Cloverfields derived its right to collect the maintenance charge through a 1959 conveyance from Guaranteed and thus the 1964 forfeiture had no effect upon that right. We shall develop such additional facts as may be requisite to the consideration of each point.

## 1 and 2

Points 1 and 2 are so intertwined that we shall discuss them together.

As we have already indicated, Code (1957, 1964 Cum. Supp.) Art. 81, § 204 (a) provides that upon the failure of a corporation to file an annual report and to pay its franchise taxes the Governor is to proclaim that the charter is "repealed, annulled and forfeited, and that the powers conferred by law upon [that corporation are] inoperative, null and void . . . ." Cloverfields does not dispute this but argues that the effect of Code (1957), Art. 23, § 85 (d) [4] is to validate the instruments in question once articles of revival were filed, as was done here. That section provides:

> "*Effect of revival.* — Such revival of the charter of the corporation shall validate all contracts, acts, matters and things made, done and performed within the scope of its charter by the corporation, its officers and agents during the time when the charter was void, with the same force and effect and to all intents and purposes as if the charter had at all times remained in full force and effect. All real and personal property, rights and credits of the corporation at the time its charter became void and of which it was not divested prior to such revival shall be vested in the corporation, after such revival, as fully as they were held by the corporation at the time its charter became void. The corporation after such revival shall be liable for all contracts, acts, matters and things made, done or performed in its name and on its behalf by its officers and agents prior to such revival as if its charter had at all times remained in full force and effect."

Cloverfields is quite correct in believing that the provision relative to annual reports, franchise taxes, and forfeiture of charters came into the law as a tax measure. We could spend

---

4. Now found in Code (1975) § 3-513 Corporations and Associations Article.

a lot of time tracing its origin from the enactment of Chapter 244 of the Acts of 1890 down to the present time, all of which would merely confirm this statement without shedding any additional light upon the issues here. This forfeiture statute has been considered by this Court on three occasions. It was tangentially mentioned in a fourth case which considered the effect of the revival statute.

The first consideration came in *Distillery v. Distilling Co.*, 168 Md. 212, 177 A. 473 (1935). There the appellant sought to enjoin the appellee from using the name "Stewart Distilling Company," the name of the appellant at the time of the forfeiture of its charter for failure to pay its franchise tax. The charter had been forfeited in 1929 and revived in 1933 under the name of American-Stewart Distillery, Inc. The appellee had been incorporated earlier in 1933 under the name of Stewart Distilling Company. A second purpose of the bill there was to enjoin the appellee from using any of the trade-marks, trade-names, and brands of appellant, said to have been in use as early as 1788. Judge Johnson pointed out for the Court:

> "[Code (1924) Art. 81, § 103] under which appellant's charter was forfeited, provides that from and after its effective date of dissolution 'the charters or certificates of incorporation of all such corporations which have not [then] paid all taxes, interest and penalties due as aforesaid, shall be *ipso facto* repealed, annulled and forfeited and the powers granted to such corporations shall be inoperative, null and void, without the necessity of proceedings of any kind either at law or in equity.' There is, however, a provision annexed permitting such corporations to become revived within six months from dissolution upon paying the penalties named in the act. It thus appears to have been the intent that, upon paying such penalties within the six months' period, the defaulting corporation was permitted to function *exactly* as before, which included the use of its former name, but without

such revival within the period it must forever remain dead. This was the appellant's situation until the passage of chapter 381 of the Acts of 1931, which was further amended by chapter 322 of the Acts of 1933 (now section 144$\frac{1}{2}$ of article 81 of Code, Supp. 1929 [as added by section 2 of the Act of 1931, as amended by the Act of 1933]). The appellant's charter was revived under the act last mentioned, which by its terms gave all corporations whose charters had been forfeited the right to be revived at any time upon compliance with certain conditions. The first of these required that the name of the old corporation at the time its charter was forfeited should be given, and another condition required that the name by which it would be known after revival must be given. Upon compliance with these conditions and payment of the required penalties, fees, etc., the corporation could be revived. The requirement as to giving its future name would seem to indicate that its old name might not be available, since it is further provided that the name must be such as could be adopted by a corporation of the state, organized or existing at the time of the receipt for record of the articles of revival.

"It has been urged by counsel for appellant that this statute, permitting revival at any time by complying with the prescribed conditions, was a warning to the appellee not to select the name the 'Stewart Distilling Company' which had formerly been the name of the appellant, or in selecting such name it did so at its peril, and can now be compelled to surrender it in favor of the revived corporation; but we do not so construe the statute. To place this construction upon it, we would have to conclude from the language of the act that the Legislature intended to place a burden upon those about to form a new corporation of ascertaining the names which, although not then in use, had ever

been used in the past, even though the corporations which had once used such names were dead; that the Legislature was more interested in keeping a name for a dead corporation which showed no evidence of ever desiring to pay its obligations to the State than it was to allow a new corporation, which was ready to do business with the State upon a cash basis, to have such name." *Id.* at 217-18. (Emphasis in original.) (Third bracketed material in original.)

In response to a contention by the appellee that the bill of complaint showed upon its face that any rights the appellant had in the old company as a trade-name were lost by abandonment and that neither a trade-name nor good will could exist independently of the business to which they adhered, the Court observed in part:

"[T]he forfeiture of its charter did not destroy its assets, but the same were thereupon automatically transferred to its directors, as trustees, for the use of creditors, stockholders, and members, and held by such trustees until the revival of the corporation, by the express terms of which, under its new name, it became vested with all real and personal property, rights, and credits of the former corporation at the time its charter was forfeited, and which had not previously been disposed of. Article 23, sec. 95, of the Code; article 81, sec. 144$^{1}/_{2}$ (e); chapter 322, Acts 1933." *Id.* at 220.

The references to Art. 81, § 144$^{1}/_{2}$ (e) and to Chapter 322 of the Acts of 1933 are to the enactment of § 144$^{1}/_{2}$ by Chapter 381 of the Acts of 1931 and to its revision in 1933, all of which pertain to articles of revival. Code (1924) Art. 23, § 95, to which reference was made, provided:

"Upon the dissolution of any corporation of this State in any manner otherwise than by judicial proceedings, and until other persons shall be appointed as receivers by some court of competent

jurisdiction, the directors at the time of dissolution shall become and be trustees for the creditors, stockholders and members of the corporation so dissolved. They shall take title to its assets, real and personal, and shall have full power to wind up and settle its affairs, to use [sic] for and collect its assets and to pay its debts; and they shall divide among the stockholders or members, the money and other property that shall remain after the payment of the debts and necessary expenses; and the said trustees shall be jointly and severally liable to the creditors, stockholders and members of such corporation to the extent of its property and effects that shall come into their hands."

It will be perceived that it is similar to Code (1957) Art. 23, § 78 applicable to the proceeding here, which provides in pertinent part: [5]

"(a) *Directors become trustees of assets until appointment of receiver.* — Upon dissolution of any corporation of this State, and unless and until one or more receivers of the property and assets of the corporation have been appointed by a court of competent jurisdiction, the directors shall become and be, for purposes of liquidation, trustees of the property and assets of the corporation so dissolved.

"(b) *Powers of directors as trustees.* — In the liquidation of the corporation and the winding up of its affairs, such trustees shall, until a receiver is appointed by such court, be vested, in their capacity as trustees, with full title to all the property and assets of the corporation. They shall proceed to collect and distribute the assets of the corporation, applying such assets to the extent available to the payment, satisfaction and discharge of existing debts and obligations of the corporation, including necessary expenses of liquidation, and distributing

5. See Code (1975) § 3-410 Corporations and Associations Article for the now comparable provision.

the remaining assets among the stockholders. They shall have power to carry out the contracts of the corporation; they may sell all or any part of the assets of the corporation at public or private sale; they may sue or be sued in their own names as trustees, or, notwithstanding such dissolution, in the name of the corporation; and they shall have power to do all other acts and things consistent with law and the charter of the corporation, necessary or appropriate to carry into effect the liquidation of the corporation and the winding up of its affairs. The will of a majority of the trustees shall govern."

The statute was next considered by the Court in *Atlantic Mill & Etc. Co. v. Keefer,* 179 Md. 496, 20 A. 2d 178 (1941). In that case a mechanics' lien had been filed in the name of the appellant after its charter had been declared forfeited. On the same day a bill to foreclose the mechanics' lien was filed. About 14 months after the filing of the mechanics' lien a petition was filed asking leave to file an amended bill of complaint on the ground that it had just been discovered that the mechanics' lien was not in proper form since the proper parties were not correctly named in it. No authority was asked to file an amended mechanics' lien. However, an amended mechanics' lien was filed in the name of an individual trading as a name similar to the former corporation together with an amended bill of complaint seeking to foreclose the mechanics' lien. Under the statutes then in effect a very limited time existed for the filing of a mechanics' lien after the last work was done or last materials delivered. The amended mechanics' lien was filed after that time. A demurrer to the amended bill of complaint was interposed on grounds which included that the original bill was filed by a corporation; the amended bill was filed by an individual trading as a name similar to that corporation, "an entirely new party plaintiff," not previously in the case, "and who [could] not, under the circumstances, file said amended bill, and [was] not a proper party to do so"; and that "the alleged amended mechanics' lien, referred to in

said amended bill of complaint, [was] not a valid lien on the property of th[o]se defendants, in that the same was not procured within the time prescribed by law. . . ." This demurrer was sustained, a stipulation having been entered before the chancellor that the charter of the original lienor had been forfeited and was no longer in existence. This Court referred to the forfeiture statute, pointed out that a provision was made for revival of charters, and said that such provision had not been used in that case. Judge Collins then went on to say for the Court:

> "Moreover, the forfeiture of its charter did not destroy its assets, the same being automatically transferred to its directors, as trustees, for the use of creditors, stockholders, and members, and held by such trustees until the revival of the corporation. Code, art. 23, sec. 100; art. 81, sec. 153; *American-Stewart Distillery v. Distilling Co.*, 168 Md. 212, at page 220, 177 A. 473." *Id.* at 499.

\* \* \*

> "The original mechanics' lien, filed April 29th, 1939, was inoperative, null and void as the petitioner was not in existence and had no power to file the lien. Such petitioner not being in existence and having no authority to enforce rights acquired during the life of its charter could not file the alleged mechanics' lien, could not file the original bill of complaint for its enforcement, could not file a petition for authority to file an amended bill of complaint. The amended lien was not filed by the directors of the corporation as trustees nor by a receiver or receivers of the corporation, but by 'Herman M. Meyer, trading as Atlantic Mill and Lumber Company.' It therefore appears that the amended bill of complaint of 'Herman M. Meyer, trading as Atlantic Mill and Lumber Company,' was an entirely new action and that the amended mechanics' lien, an entirely new claim filed more than six months after the time fixed by statute

(Code, art. 63, sec. 23) was no lien and is, therefore, not enforceable." *Id.* at 500-01. (Citing cases.)

Reference to the forfeiture statute was made in *Callahan v. Clemens*, 184 Md. 520, 41 A. 2d 473 (1945), where suit was brought against the directors, as trustees of a corporation whose charter had been forfeited for nonpayment of taxes. Judge Henderson there said for the Court relative to certain of the defendants:

"The defendants Joseph Meyerhoff, Isidore Goldberg and Jacob Meyerhoff were directors of the corporation at the time of its dissolution, and they are joined as directors on the theory that they are trustees and jointly liable to any creditor, having a claim against the corporation, to the extent of its assets in their hands." *Id.* at 523-24.

The Court further explained:

"The case against the Meyerhoffs and Goldberg, as directors, is based upon Section 100 of Art. 23 of the Code, which provides in effect that directors become trustees for the benefit of creditors, stockholders and members to the extent of the corporate assets coming into their hands upon dissolution. Dissolution occurred on February 23, 1939, and the rights of creditors became fixed at that time; the forfeiture put an end to the corporate existence. *Atlantic Mill & Lumber Realty Co. v. Keefer*, 179 Md. 496, 20 A. 2d 178; *Fletcher, Corporations*, Secs. 8141, 8220." *Id.* at 528.

In *Messall v. Merlands Club*, 244 Md. 18, 34-35, 222 A. 2d 627 (1966), *cert. denied*, 386 U. S. 1009 (1967), the Court had before it a controversy involving a revived corporation. There was a contention that since the revival validated all contracts, acts, matters, and things made, done and performed by the officers and agents of the corporation during the time when the charter was void with the same force and effect as if the charter had at all times remained in full force and effect (citing Art. 23, § 85 (d)) that

thus any default caused by such a forfeiture of the corporate charter was made whole and obliterated. The trial court was quoted as saying:

"It is difficult to perceive how the later validation of acts of officers of the corporation during the period of forfeiture affects the fact that by the forfeiture ownership of the lease devolved upon persons other than the Lessee by operation of law from October 31, 1962 to January 27, 1964, which fact constitutes a default by the Lessee under the provisions of the lease and which default was in existence at the time the option to purchase was attempted to be exercised on December 18, 1962. The ultimate validation of the acts of the directors by making such acts the acts of the corporation does not alter the fact that by reason of the forfeiture the lease devolved on persons other than the Lessee which was the situation when the option to purchase was attempted to be exercised." *Id.* at 34-35.

This Court said, "[W]e think Judge [J. DeWeese] Carter has correctly stated the law."

Herbert M. Brune, Jr., Esq., of the Baltimore Bar in *Maryland Corporation Law and Practice* § 402 (rev. ed. 1953) opines that the "statutory methods ... for the termination of corporate life" include "[f]orfeiture of charter for non-payment of taxes, or for failure to file an annual report, by proclamation of the Governor," a subject which he discusses in § 406. He points out there that under a previous statute our predecessors held in *Murphy v. Wheatley*, 102 Md. 501, 63 A. 62 (1906), that a proceeding by the State for forfeiture of the charter of a corporation coming within the terms of the statute was a necessary prerequisite to its dissolution but the statute then did not contain the clause "without the necessity of proceedings of any kind either at law or in equity" found in the present statute. He then goes on to say, citing *Callahan* and *Atlantic:*

"The decision in Murphy v. Wheatley is not,

therefore, an authority with respect to the present Act, and two recent cases have recognized that the proclamation puts an end to the corporate existence without the necessity of any further proceedings." *Id.* at 466.

Relative to what was then Code (1951) § 74 concerning the powers of directors as trustees where a corporation is dissolved without appointment of receivers (§ 78 in the 1957 Code to which we have previously alluded), Brune says in § 408:

"The section evidently applies to (1) corporations voluntarily dissolved by the filing of articles of dissolution (unless and until receivers are appointed) and (2) corporations whose charters are forfeited for non-payment of taxes or failure to file reports." *Id.* at 478.

Given the statements of our predecessors, the interpretation by a Maryland authority in the field of corporation law such as Mr. Brune, and the plain language of the statute (upon dissolution and until the appointment of receivers the directors are to be trustees for the purposes of liquidation with powers including sale of any assets), we conclude that the surviving directors of Guaranteed had power under the statute to convey to Seabreeze if Guaranteed had not been divested of title by the purported conveyance by Guaranteed after the charter was declared forfeited. Cloverfields would have us hold that between the time of the effective date of the Governor's proclamation and the filing of articles of revival Guaranteed was in a state of suspended animation and thus the effect of Art. 23, § 85 (d) is to validate the 1965 instruments just as a curative statute might validate a deed improperly acknowledged. In the view we take of this case it is not necessary to set forth holdings in cases in other states for the reason that we neither have been cited to nor have we found a statute completely identical with the Maryland statute. We thus come down to a question of statutory interpretation.

Late last year we observed in *Howell v. State*, 278 Md. 389, 364 A. 2d 797 (1976):

> "The rules for statutory construction in Maryland are well known: that in ascertaining the intention of the General Assembly all parts of a statute are to be read together to find the intention as to any one part; all parts are to be reconciled and harmonized if possible; if there is no clear indication to the contrary and it is reasonably possible, a statute is to be read so that no word, clause, sentence, or phrase shall be rendered surplusage, superfluous, meaningless, or nugatory; and the cardinal rule of statutory construction is to ascertain and carry out the real legislative intent and in ascertaining that intent the court considers the language of an enactment in its natural and ordinary signification." *Id.* at 392. (Citing cases.)

At that time we also referred to the succinct statement of our predecessors in *Cearfoss v. State*, 42 Md. 403 (1875):

> "Statutes should be interpreted according to the most natural and obvious import of their language, without resorting to subtle or forced construction, for the purpose of either *limiting* or *extending* their operation. Dwarris on Stat. 144." *Id.* at 407. (Emphasis in original.)

To permit the revival statute to breathe life into the 1965 instruments here would be, as Chief Judge Gilbert pointed out for the Court of Special Appeals, to ignore that sentence of § 85 (d) which states:

> "All real and personal property, rights and credits of the corporation at the time its charter became void *and of which it was not divested prior to such revival* shall be vested in the corporation, after such revival, as fully as they were held by the corporation at the time its charter became void." (Emphasis added — as did Judge Gilbert.)

We agree with the conclusion of the Court of Special Appeals:

> "We think former § 85 (d) to be clear and unambiguous in that the revived corporation may only take title to those assets which were legally not disposed of during the period of corporate demise. Inasmuch as the surviving trustees had, in 1971, validly conveyed and assigned the very property [Cloverfields] thought it had acquired in 1965, the total effect of the revival in this case is naught. The act of revival cannot divest a *bona fide* purchaser of his title." *Id.* 32 Md. App. at 434-35.

Cf. *Redwood Hotel, Inc. v. Korbien,* 197 Md. 514, 80 A. 2d 28 (1951). In that case intervening rights did not exist as here. The holding there was consistent with that in *J. B. Wolfe, Inc. v. Salkind,* 3 N. J. 312, 70 A. 2d 72 (1949), where Chief Justice Vanderbilt said that the objects of statutes such as ours are solely the raising of revenue for the State, the police aspects being covered by a provision (similar to ours) making it unlawful to "exercise or attempt to exercise any powers under the charter of any such corporation after such proclamation shall have issued," and refers to cases "uniformly holding that a reinstatement of a repealed charter relates back to the date of the proclamation of repealer and validates corporate action taken in the interim." Our statute validates such action, but not where other rights have intervened because it states specifically that the property and rights of which the corporation has been divested prior to its revival are not vested again in the corporation. To hold otherwise would be to fail to heed the rules of statutory construction.

3

Cloverfields urges, citing *Flickinger v. Hull,* 5 Gill. 60 (1847), that the 1965 instruments should be regarded as valid. The significance of *Flickinger* is the following statement:

> "Where a person in one character is debtor, and the same person in another character is creditor, the

law regards the debt as paid by the debtor capacity to the creditor.

> "This is on the same principle which governs the case where a man has several capacities, and is found in possession of property, the law will attach the possession to the capacity in which, of right, it ought to be held; so also, where having various capacities, he executes an authority delegated to him in one of those capacities, the law will attribute the act to the proper authority, although the person does not profess to exercise it, in virtue of that particular power." *Id.* at 74-75.

There are other cases at least implying a similar holding, but *Flickinger* and those cases are not apposite here. Mrs. Wallman did not purport to convey in the instruments she executed here. She did not signify in any manner an intent to execute those instruments as a maker of the instruments in any capacity. She purported only to attest just as a notary or other witness might attest a signature. It is impossible to infer from this instrument and its manner of execution the use of any power and authority that might have resided in her as one of the surviving directors of Guaranteed.

4

The contention of Cloverfields that Seabreeze "had actual knowledge of the prior rights and equities of [Cloverfields] and [thus] was *not* a bona fide purchaser" must likewise fall. (Emphasis theirs.) The 1965 instruments were void because the corporation was dead and its powers terminated. In *Maskell v. Hill*, 189 Md. 327, 336, 55 A. 2d 842 (1947), our predecessors held "the recording of a forged deed is not constructive notice to the owner whose signature is forged." In *Clarke v. Brunk*, 189 Md. 353, 360, 55 A. 2d 919 (1947), the Court held that the recordation of an option agreement not entitled to be recorded because it was not acknowledged gave no constructive notice. Long prior to that in *Johns v. Scott*, 5 Md. 81 (1853), our predecessors held that the recordation of a defectively acknowledged deed could not affect a bona fide purchaser without notice. 6 R. Powell, *The Law of Real Property* § 916, at 295 (1977), holds notice not to be imputed in the case of the recording of a void instrument. We decline

to hold that an instrument void because executed by one without power to execute by reason of the non-existence of the corporation on whose behalf he purported to execute is such as to deprive Seabreeze of its status as a boña fide purchaser.

5

In its opinion the Court of Special Appeals referred to

"the anomaly that has been created by the imprudent conveyancing conducted in this case. [Cloverfields], which now owns the clubhouse and boat basin, has no right to collect the annual fee for the maintenance of those facilities. Seabreeze, which has the power to collect the twenty dollar ($20.00) per lot annual charge for the purpose of maintaining the recreational facilities, does not own the facilities." *Id.* 32 Md. App. at 436.

At argument before us it was made plain that the prime concern of Cloverfields was not the $20.00 fee, but the ownership of streets and the right to control development. Counsel for Seabreeze stated that his clients have been and are willing to assign to Cloverfields the right to collect the annual lot charge provided that Cloverfields recognizes that the recreational facilities were held for the benefit of all lot owners in the development. Counsel for Cloverfields stated such was agreeable with his clients. In the light of this concession, we need not consider this point.

*Judgment affirmed; appellants to pay the costs.*

On Motion For Reconsideration

PER CURIAM:

One of the contentions of Cloverfields in its brief and argument to us was that it derived the right to collect a maintenance charge for the recreational facilities through a 1959 conveyance from Guaranteed and thus the forfeiture of Guaranteed's charter in 1964 had no effect upon this right, treating the purported conveyance in 1965 as surplusage. In

short, it maintained that it was entitled to collect the maintenance charge from all of the lots in the subdivision. We did not address ourselves to that point because of the concession in open court at the time of oral argument.

A motion for reconsideration is now made with a request that we specifically consider this portion of Cloverfields' argument because Seabreeze is now taking the position that this concession did not extend to any lots owned by Seabreeze under either the original or any other conveyances to it and that the maintenance charge would be payable with respect to any such lots only from the time such a lot was transferred by Seabreeze to a third party.

There is no room for misunderstanding as to what was said. We have carefully played back the tape of the argument. It reflects the following:

> "JUDGE SMITH: Who owns the majority of the lots? Does your corporation own the majority of the lots?
>
> "MR. SUSSMAN, counsel for Seabreeze: I believe we presently own the majority of the lots that are remaining. I believe we still do. Your honors — and I stated this before — unfortunately I have to agree with what Mr. Sause is saying. *There is no argument here about lot charges or who should maintain the recreation area or collect [for] the lots.* These people are really met on another battlefield. The battlefield is the enforcement of the restrictions and the improvements which have brought cases to the Court of Appeals as to approvals. That basically is the situation. We have no problem with the other situation. Nobody ever has.
>
> "JUDGE SMITH: Well, now do I understand from that that you — your corporation would be prepared to assign to the association here the right to collect these charges on the —
>
> "MR. SUSSMAN: We always have been, your honor — we always have been. That's not the bone

of contention in this case. The bone of contention is how do you equitably approve homes and build homes?

\* \* \*

"MR. SUSSMAN: *There is an anomaly. Theoretically, we are entitled to collect the lot charge and pass it over to them for use at the recreation area.* I apologize — I am afraid I have been too —

"JUDGE ELDRIDGE: You say you are willing to assign that right?

"MR. SUSSMAN: Pardon me, your honor?

"JUDGE ELDRIDGE: You say you are willing to assign that right?

"MR. SUSSMAN: We have always been willing to assign it.

"JUDGE ELDRIDGE: That right? So that is not really —

"MR. SUSSMAN: I am willing to assign it with one caveat but I do not believe Mr. Sause will argue about this. There is nothing in the record at the present time which requires or states of record that the Improvement Association holds the recreational area for the benefit of all lot owners at Cloverfields in common. If they are willing — although I am perfectly willing — I believe that was always the intention of the conveyance to them. If they are willing as a matter of record to impose that trust upon that recreational area that it is held in trust, then I am perfectly willing to pass to them the right to collect the lot charges, but I think I am entitled to that right.

\* \* \*

"MR. SAUSE, counsel for Cloverfields: Finally, I would like to add a little footnote to what Mr. Sussman says. We have never been offered the rights to the recreation fee—

"JUDGE ELDRIDGE: You have now.

"MR. SAUSE: Unless we would take a dive with regard to the restrictions which we are not really prepared to do. If there are no strings attached I don't think my clients would have a bit of objection to accepting it —

"JUDGE DIGGES: He said the only restriction was —

"JUDGE ELDRIDGE: Was that it would be for the benefit of everybody.

"MR. SAUSE: I don't think we have any question about that. May I take that as an admission in open court that —

"JUDGE ELDRIDGE: I would say, 'I accept,' if I were you.

"CHIEF JUDGE MURPHY: Mr. Sause, you have a number of witnesses available to you.

"MR. SAUSE: Fine. Thank you, sir." (Emphasis added.)

Given the statement that "[t]here [was] no argument here about lot charges or who should maintain the recreation area or collect [for] the lots" and the asserted willingness of Seabreeze to assign to Cloverfields the right to collect the lot charge if Cloverfields recognized that the recreational area was to be held in trust "for the benefit of all lot owners at Cloverfields in common," it follows that the concession concerned all lots, which would include those lots owned by Seabreeze. We hold this to be a binding concession. *See generally* 2 J. Poe, *Pleading and Practice* § 10, at 27 (5th ed., Tiffany 1925); 1 E. Thornton, *Attorneys at Law* §§ 258-65 (1914); 5B C.J.S. *Appeal and Error* § 1837 (b), at 242 (1958); 7 C.J.S. *Attorney and Client* § 79 (1937); 7 Am. Jur.2d *Attorneys at Law* § 100 (1963); *Prince Georges Prop. v. Rogers*, 275 Md. 582, 587-88, 341 A. 2d 804 (1975); *Salisbury Beauty Schools v. St. Bd.*, 268 Md. 32, 45-46, 300 A. 2d 367 (1973); *McLhinney v. Lansdell Corp. of Md.*, 254 Md. 7, 12, 13, 254 A. 2d 177 (1969); *Secor, Adm'r v. Brown*, 221 Md. 119, 123-24, 156 A. 2d 225 (1959); *Thomas v. Hopkins*, 209 Md.

321, 326-27, 121 A. 2d 192 (1956); *Wanzer v. State,* 202 Md. 601, 608, 97 A. 2d 914 (1953); *Posko v. Climatic Control Corp.,* 198 Md. 578, 584, 84 A. 2d 906 (1951); *Bloom v. Graff,* 191 Md. 733, 737, 63 A. 2d 313 (1949); *Houston v. Wilcox,* 121 Md. 91, 100, 88 A. 32 (1913); and *Wells, etc., Council v. Littleton,* 100 Md. 416, 426, 60 A. 22 (1905). *See also De Santolo v. La Porte,* 89 N.Y.S.2d 114, 117 (1949); *Thayer v. Federal Life Ins. Co.,* 217 Wis. 282, 285, 258 N. W. 849 (1935), and *Illinois Steel Co. v. Warras,* 141 Wis. 119, 125, 123 N. W. 656 (1909). This was a stipulation or concession in open court on behalf of one of the parties as to a method for termination of a part of the litigation which was duly accepted by the other party, a concession intended to persuade this Court that it was unnecessary for us to address a certain portion of the contentions of the plaintiff below in this proceeding. Long ago in *Lewis v. Wilson,* 151 U. S. 551, 555, 14 S. Ct. 419, 38 L. Ed. 267 (1894), Mr. Justice Brewer observed for the Court, "A man may continue litigation and stand on his rights, or he may waive some of his rights for the sake of terminating litigation . . . . " Seabreeze has done just this. Accordingly, we hold that it is obliged to assign to Cloverfields its right to collect lot charges for the maintenance of the recreational area for all lots of the subdivision, including those still owned by Seabreeze, provided that Cloverfields recognizes that the recreational area is held in trust for the benefit of owners of all lots in the subdivision, which it says it is willing to do.

It is pointed out in the motion that paragraphs 5 and 6 of the decree in the Circuit Court for Queen Anne's County directed that a receiver be appointed with respect to the collection of the maintenance charges, that an audit be conducted of past receipts and disbursements, and that future disbursements be made only under order of that court. It is suggested that if we find the concession made by Seabreeze here to be binding without the attempted qualification, then that the mandate should be modified to direct the deletion of those two paragraphs from the decree. We agree.

It is further suggested in the motion that although our

opinion "implicitly recognized" that the 1965 conveyance to Cloverfields by Guaranteed was, after the revival of Guaranteed's charter, "invalid *only* as to property and interests which had been conveyed by the surviving directors to Seabreeze," we should specifically so state, pointing out that there may be conveyances, etc., made by Guaranteed subsequent to the forfeiture of its charter and prior to its revival not covered by any conveyance from the directors in the interim between forfeiture and revival. (Emphasis Cloverfields'.) We agree. The revival of the charters had the effect of validating all conveyances or other contracts made in the interim between forfeiture and revival except to the extent that this would be inconsistent with an action taken by the surviving directors as trustees in that period as in the conveyance from the surviving directors to Seabreeze.

*Motion for reconsideration denied; mandate of June 3, 1977, amended to read as follows: judgment modified by deleting from the decree in the Circuit Court for Queen Anne's County Paragraphs 5 and 6 relative to collection of lot charges and as modified affirmed; appellants to pay the costs.*