**CATALYST & CHEMICAL SERVICES, INC., et al., Plaintiffs,**

v.

**GLOBAL GROUND SUPPORT, et al., Defendants.**

**No. CIV.A.02–00388(HHK).**

United States District Court, District of Columbia.

Dec. 14, 2004.

 

 
 
 
 

 
 
 
 
 

 
 
 
 
 

 
 
 
 
 

 
 
 
 

 
 

Scott M. Daniels, Armstrong Wester-man & Hattors LLP, Lead Attorney, Washington, DC, for Plaintiffs.

Steven D. Gordon, Holland & Knight LLP, Elliot E. Polebaum, Jay D. Majors, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiffs, Catalyst Chemical Services, Inc., John R. Gaughan, and Whisper Wash Development Corp., bring this action against defendants, Global Ground Support and William Dempsey, for misappro-priation of trade secret, breach of contract, and patent infringement. Presently be-fore this court are plaintiffs' motions for summary judgment [# 37, 38, 44, 53, 54], defendants' motion for summary judgment [# 39], and defendants' motion to dismiss [# 73]. Upon consideration of the parties' motions, the oppositions thereto, and the record of this case, the court concludes that plaintiffs' motions for summary judg-ment must be denied, defendants' motion for summary judgment must be granted in part and denied in part, and defendants' motion to dismiss must be granted.

## I. BACKGROUND INFORMATION

John R. Gaughan ("Gaughan") is the owner of Catalyst Chemical Services, Inc. ("Catalyst") and owns 90% of the stock of Whisper Wash Development Corp. ("Whis-per Wash"), and is Whisper Wash's sole officer and director. Second Am. Compl. ¶ 2. Gaughan and his companies obtained U.S. Patent No. 5,104,068 (issued April 14, 1992) (hereinafter '068 patent) for the de-velopment of a process and apparatus for de-icing commercial aircraft to be used prior to take off. Defs.' Statement of Ma-terial Facts ¶¶ 1–2. William H. Dempsey ("Dempsey") is currently president of Global Ground Support ("Global"), the suc-cessor in interest of Terex Aviation Ground Equipment ("Terex") where Dempsey was Director of Operations in 1997. Id. ¶ 21; Second Am. Compl. ¶ 4. Through his work for Global, Dempsey sells and markets aircraft de-icing equip-ment. Second Am. Compl. ¶ 5.

On or about July 28, 1997, Dempsey, acting as Director of Operations for Terex, signed a confidentiality agreement with Catalyst in an effort to establish a business relationship. Second Am. Compl. ¶¶ 14–15; see Confidentiality Agreement (Ex. A to Second Am. Compl.). Operating under the aegis of the confidentiality agreement, plaintiffs disclosed to defendants the infor-mation regarding the operation of plain-tiffs' de-icing equipment. Ex. 2 to Pls.' Opp'n (Gaughan Decl. ¶¶ 6, 11). The busi-ness relationship never materialized, how-ever. Id. ¶ 13.

On August 26–27, 2001, at the 10th An-nual Aircraft and Airfield Deicing Confer-ence & Exposition held in Washington, D.C., defendant Dempsey, as president of Global, gave an oral and video presentation

describing the operation of his company's Ice Wolf de-icing equipment in which plaintiffs allege he disclosed their trade secrets. Second Am. Compl. ¶ 17; *see* Videotape Tr. (Ex. 2C to Pls.' Mot. for Supp. Summ. J. for Literal Infringement). Plaintiffs also allege that defendants are infringing their patent by selling their Ice Wolf de-icing equipment within the United States so that third parties can practice methods within the scope of the '068 patent. *Id.* ¶¶ 37–38. On August 26, 2002, at the 11th Annual Aircraft and Airfield Deicing Conference & Exposition held in Washington, D.C., Gaughan distributed to industry representatives a flyer reasserting the trade secret and patent infringement allegations he made against defendants in district court. "Global Compl." (NC Complaint) ¶ 9.

Catalyst, Gaughan, and Whisper Wash then filed an action in this court alleging misappropriation of trade secret, breach of contract, and patent infringement. Global and Air T, Inc. ("Air T"), which owns 100% of Global's capital stock, filed a complaint in the Superior Court of North Carolina, Catawba County, Civ. No. 02–52794, alleging defamation and unfair and deceptive trade practices, which was removed to federal court and transferred to this judicial district. These two actions were consolidated on September 5, 2003.

## II. ANALYSIS

Plaintiffs seek summary judgment on their claims for literal infringement, willful infringement, defamation and unfair competition, patent validity,[1] and on the enforceability of the '068 patent.[2] Defendants move for summary judgment on all claims—but make specific arguments only with respect to the misappropriation of trade secrets claim and patent infringement claim—and move to dismiss Catalyst and Whisper Wash for lack of standing.

### A. Standard of Review

#### 1. Summary Judgment

Under Rule 56, a motion for summary judgment should be granted only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party's "initial responsibility" consists of "informing the [trial] court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted).

If the moving party meets its burden, the burden then shifts to the non-moving party to establish that a genuine issue as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To meet its burden, the non-moving party must show that " 'the evidence is such that a reasonable jury could return a verdict' " in its favor. *Laningham v. United States*

---

1. Plaintiffs' motion for summary judgment on patent validity must be denied as moot because defendants no longer argue that the patent is invalid. *See* Defs.' Opp'n to Pls.' Mots. for Summ. J. at 1 n. 2.

2. Plaintiffs ask the court to find that the '068 patent "is not unenforceable because of alleged inequitable conduct committed in an unrelated trademark application." Pls.' Mot. for Summ. J. on Non–Unenforceability at 1. The court assumes *arguendo* that the '068 patent is valid and enforceable for purposes of deciding the literal and willful infringement issues.

*Navy,* 813 F.2d 1236, 1241 (D.C.Cir.1987) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Such evidence must consist of more than mere unsupported allegations or denials and must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 322 n. 3, 106 S.Ct. 2548. If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Summary judgment is as appropriate for a patent infringement claim as for any other claim. *See, e.g., Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 835–36 (Fed.Cir.1984) (patent infringement).

### 2. Motion to Dismiss

▬ A motion to dismiss for lack of subject matter jurisdiction based on a party's lack of standing is analyzed under Rule 12(b)(1). The court must accept as true all factual allegations contained in the complaint. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). At the same time, the plaintiff bears the burden of establishing the court's jurisdiction. *Grand Lodge of the Fraternal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 13 (D.D.C.2001) (citation omitted). "A motion to dismiss under Rule 12(b)(1) for lack of standing . . . involves an examination of the face of the complaint . . . ," *Haase v. Sessions,* 835 F.2d 902, 908 (D.C.Cir.1987), and the plaintiff's allegations therein require "closer scrutiny" than they would under the Rule 12(b)(6) motion to dismiss standard. *Bates v. Rumsfeld,* 271 F.Supp.2d 54, 59–60 (D.D.C.2002) (quoting *Grand Lodge,* 185 F.Supp.2d at 13–14 (citations omitted)). Additionally, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coalition for Underground Expansion v. Mineta,* 333 F.3d 193, 198 (D.C.Cir.2003) (quoting *Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 197 (D.C.Cir.1992) (citations omitted)).

### B. Misappropriation of Trade Secret

▬ Plaintiffs' misappropriation of trade secrets claim is premised on defendants' alleged disclosure of parameters of temperature, pressure, angle and distance useful in operating de-icing equipment. Plaintiffs seek damages pursuant to D.C.Code § 36–401 *et seq.* ("Trade Secrets Act"). "Misappropriation" is defined by the statute as:

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

. . . . .

(ii) At the time of disclosure or use, knew or had reason to know that the trade secret was:

. . . . .

(II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . .

D.C.Code § 36–401(2).[3] Thus, the three elements required to make out a claim for trade secret misappropriation are:

---

**3.** This statute has been interpreted only once in a reported decision by a court in this circuit and that decision was very limited in its scope. *See Morgan Stanley DW Inc. v. Rothe,* 150 F.Supp.2d 67, 76 (D.D.C.2001) (holding that customer lists can qualify as trade secrets). In light of the paucity of precedent from this jurisdiction for interpreting this statute and because the D.C. Trade Secrets Act is based on the Uniform Trade Secrets Act, 14 U.L.A. 437 (amended 1985), as are the trade secrets statutes of several states,

(1) "existence of a trade secret";

(2) "acquisition of the trade secret as a result of a confidential relationship"; and

(3) "unauthorized use [or disclosure] of the secret" resulting in loss or damages.

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1360 (Fed.Cir. 2002); *see also Computer Mgmt. Assistance Co. v. Robert DeCastro, Inc.*, 220 F.3d 396, 403 (5th Cir.2000); *Lemmon v. Hendrickson*, 559 N.W.2d 278, 279 (Iowa 1997).

#### 1. Existence of a Trade Secret

■ The "threshold inquiry" in every trade secret case is "whether or not there [is] a trade secret to be misappropriated." *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 147 F.Supp.2d 1057, 1065 (D.Kan.2001) (citations omitted); *accord Jensen v. Redev. Agency of Sandy City*, 998 F.2d 1550, 1556 (10th Cir.1993); *Reinforced Molding Corp. v. Gen. Elec. Co.*, 592 F.Supp. 1083, 1087 (W.D.Pa.1984); *Carolina Chem. Equip. Co. v. Muckenfuss*, 322 S.C. 289, 471 S.E.2d 721, 724 (1996). Under the D.C. statute, a "trade secret" is defined as follows:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and

(B) Is the subject of reasonable efforts to maintain its secrecy.

D.C.Code § 36–401(4). Interpreting this language, courts have imposed the following requirements before information will be protected as a trade secret:

(a) the "information must be secret";

(b) "its value must derive from the secrecy"; and

(c) "the owner . . . must use reasonable efforts to safeguard the confidentiality" of the information.

*Motor City Bagels, LLC v. Am. Bagel Co.*, 50 F.Supp.2d 460, 478 (D.Md.1999); *accord IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir.2002); *Standard Register Co. v. Cleaver*, 30 F.Supp.2d 1084, 1094 (N.D.Ind.1998); *APAC Teleservices, Inc. v. McRae*, 985 F.Supp. 852, 864 (N.D.Iowa 1997); *Curtis 1000, Inc. v. Pierce*, 905 F.Supp. 898, 901 (D.Kan.1995).

##### a. Secrecy of Information

■ "[T]he hallmark of a trade secret is not its novelty but its secrecy." *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 575 (4th Cir.1994). Information that is "generally known or readily ascertainable to the public" cannot constitute a trade secret. *State ex rel. the Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St.3d 513, 687 N.E.2d 661, 675 (1997); *accord Microbix Biosys., Inc.*

it is appropriate to consider how the courts in those states have interpreted their states' trade secret acts when interpreting the D.C. trade secrets statute. *Cf. Dicks v. Jensen*, 172 Vt. 43, 768 A.2d 1279 (2001) (holding that because the Vermont trade secrets act is based on the Uniform Trade Secrets Act, in interpreting the state trade secrets statute the court "draw[s] from the decisions of [their] sister states"); *World Wide Prosthetic Supply, Inc. v. Mikulsky*, 246 Wis.2d 461, 631 N.W.2d 253, 257 n. 5 (2001) (holding that in the absence of interpretive decisions from within the forum state "[the court] can look to Uniform Trade Secrets Act decisions in other jurisdictions for guidance"), *aff'd*, 251 Wis.2d 45, 640 N.W.2d 764. It is particularly appropriate to look to the Trade Secrets Act decisions of courts in other jurisdictions because the D.C. statute was intended to "make uniform the law with respect to trade secrets among the District of Columbia and those states enacting it," D.C.Code § 36–408.

*v. Biowhittaker, Inc.*, 172 F.Supp.2d 665, 674 (D.Md.2000); *IBM Corp. v. Seagate Tech., Inc.*, 941 F.Supp. 98, 100 (D.Minn. 1992). Furthermore, information which is "generally known within an industry," even if it is not generally known to the public, cannot constitute a trade secret. *Mangren Research & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 942 (7th Cir.1996); *accord Pope v. Alberto–Culver Co.*, 296 Ill.App.3d 512, 230 Ill.Dec. 646, 694 N.E.2d 615, 617 (1998). However, it is widely accepted that "a trade secret can exist in a combination of characteristics ... each of which, by itself, is in the public domain," *Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir.2001), and "even if all of the information [about those characteristics] is publicly available, a unique combination of that information, which adds value to the information ... may qualify as a trade secret." *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir.2003). *Accord Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir.2003). *But see Strategic Directions Group, Inc. v. Bristol–Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002) (holding that simply asserting that a trade secret resides in some combination of otherwise known information by itself is not sufficient to satisfy the requirements for a trade secret).

■■■ Plaintiffs allege the parameters relating to angles, distances, pressures and temperatures used by their de-icing process should be protected under the Trade Secrets Act. Pls.' Opp'n at 2. However, "once material is publicly disclosed, it loses any status it ever had as a trade secret." *State ex rel. Rea v. Ohio Dep't of Educ.*, 81 Ohio St.3d 527, 692 N.E.2d 596, 601 (1998) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)). Defendants have submitted exhibits showing that each parameter individually was within industry knowledge before defendants' alleged disclosure. *See* Exs. L, M, N, P, Q, & W to Defs.' Reply. Plaintiffs, however, do not allege only that each parameter individually is a trade secret; rather, they also argue that all four elements taken together in precise combination constitute a legally protected interest under the Trade Secrets Act. Pls.' Opp'n at 4. The record does not show that all four parameters were disclosed together, in a specific combination, to the industry.[4] Therefore, a genuine issue remains as to whether the specific combination of the parameters is "secret" sufficient to warrant protection under the Trade Secrets Act.

#### b. *Value Derived from Secrecy*

■■■ In order to be protected under the Trade Secrets Act, the combination must

4. Defendants also contend that because the parameters can be ascertained from the public record through Gaughan's patent (as admitted by Gaughan himself, *see* Ex. 1 to Defs.' Mot. for Summ. J. (Gaughan Dep. at 131)), the parameters are readily ascertainable and therefore not protected as trade secrets. *See, e.g., Peckarsky v. ABC, Inc.*, 603 F.Supp. 688, 697 (D.D.C., 1984) ("Indeed, most of the facts contained in the article were available in the public record; ascertainment of these facts certainly required effort, but hardly the sort of effort and expense normally associated with the development of trade secrets."). However, the parameters are nowhere directly cited in the patent, *see* '068 patent, and Gaughan asserts that they could only be discovered "after applied research" requiring the expenditure of significant time and money, Ex. 1 to Pls.' Opp'n (Gaughan Dep. at 69); Ex. 2 to Pls.' Opp'n (Gaughan Decl. ¶ 11). While the amount of time and effort required to derive the parameters from the patent is unclear from the record alone, taking all factual inferences in favor of the nonmoving party, the court finds that there remains a genuine issue as to whether the patent can be deemed to disclose plaintiffs' unique combination of parameters.

derive some value from its secrecy. *IDX*, 285 F.3d at 582. Because defendants have shown that all the parameters individually are in the realm of public knowledge, any value each of those pieces may have independently is not a result of secrecy. Therefore, in order for the combination to be afforded trade secret status, the value of the specific combination of parameters must exceed the mere sum of the value of each individual parameter. *See Strategic*, 293 F.3d at 1065 (noting in a case involving a specific combination of widely-known elements that mere variations are not protected as trade secrets). A combination qualifies as a trade secret only when there is an added value to the combination over the value of the individual parameters, *i.e.*, when "the whole is more than the sum of the parts." *See Penalty Kick*, 318 F.3d at 1291 ("[E]ven if all of the information is publicly available, a unique combination of that information, which *adds value* to the information, also may qualify as a trade secret.") (emphasis added) (citations omitted); *cf. Strategic*, 293 F.3d at 1065 (holding that a combination of known elements was not protected by trade secret statute because the choice of elements was obvious and therefore the combination did not achieve a sufficient degree of secrecy).

 The only evidence defendants present to support their assertion that there is no added value in the combination of the parameters are the declarations of expert witnesses Rondal Moore and Lee Williams, who assert that plaintiffs' combination of parameters are no more than "common sense." Ex. 3 to Defs.' Mot. for Summ. J. (Moore Decl. ¶ 10); Ex. N to Defs.' Reply (Williams Decl. ¶ 6). However, neither defendants nor their experts make reference to any evidence or alleged facts to support this proposition. Conclusory assertions by expert witnesses are insufficient to allow a party to prevail on a summary judgment motion. *See On–Line Techs. v. Bodenseewerk Perkin–Elmer GmbH*, 386 F.3d 1133, 1144 (Fed.Cir.2004) (citations omitted).

### c. Reasonable Efforts to Maintain Confidentiality

 For a trade secret to be afforded protection by the courts, the owner must make "reasonable efforts to maintain its secrecy." D.C.Code § 36–401(4)(B); *see, e.g., Leggett & Platt*, 285 F.3d at 1360. Defendants assert that plaintiffs have disclosed their trade secrets in their own marketing materials, and have therefore failed to make reasonable efforts to keep such information secret. However, the only instance defendants show of a disclosure by plaintiffs of the entire combination of parameters is in a confidential fax sent during the course of business negotiations. Exs. P, Q, & R to Defs.' Reply.[5] An owner is not required to maintain absolute secrecy to retain trade secret protection. "Simply because information is disclosed outside of a company does not result in the loss of trade secret status ... 'the owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger, if the disclosure is made

---

5. The parameters included in the confidential fax are not identical to the parameters Dempsey allegedly disclosed at the August 26–27, 2001 conference. The fax includes references to 35–40 degrees and 45 degrees, a distance of 10 feet, and 200 psig for the high-pressure nozzle and 10–30 psig for the low pressure nozzle (Exs. P and R to Defs.' Reply). The transcript to Dempsey's conference presentation, meanwhile, mentions an angle of 45–60 degrees, an optimum distance of 5–20 feet, and a high-pressure nozzle at 50 or 150 psi, and a low-pressure nozzle at 11 psi (Ex. 2C to Pls.' Mot. for Summ. J. for Literal Infringement at 3, 6). There remains a genuine issue of material fact whether these discrepancies are consequential to plaintiffs' asserted trade secrets claims.

in confidence, express or implied.'" *MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F.Supp.2d 396, 416 (E.D.Va.2004) (citing *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F.Supp.2d 565, 574 (E.D.Va.2004) (internal citations omitted)). Maintaining trade secret status thus requires only reasonable efforts, such as implementing confidentiality agreements. *Id.*; *cf. Sheets v. Yamaha Motors Corp.*, 849 F.2d 179, 183–84 (5th Cir.1988) ("a disclosure of a trade secret to others who have *no obligation* of confidentiality extinguishes the property right of the trade secret." (emphasis added)). Otherwise, owners would only be able to contemplate transactions involving trade secrets, such as sales or joint ventures, at the risk of destroying the trade secrets themselves. Gaughan's fax to Dempsey was marked as confidential, putting Dempsey on notice that the enclosed information was not suitable for public disclosure. Thus, defendants have failed to show that plaintiffs' limited, confidential disclosure of the trade secrets contained in the fax transmission undercuts their efforts to maintain secrecy and impairs their assertion of trade secret protection. Summary judgment is therefore inappropriate on this ground.

2. Acquisition of the Trade Secret as a Result of a Confidential Relationship

■ The second element of misappropriation requires a showing that defendant acquired the trade secret as a result of the confidential relationship, "rather than developed independently or obtained from a third source." *Leggett & Platt*, 285 F.3d at 1360. Defendants do not contest that as a result of signing a confidentiality agreement, Ex. 1 to Second Am. Compl., plaintiffs disclosed to them confidential information about their aircraft de-icing process and apparatus, Defs.' Mot. for Summ. J. at 3. However, defendants deny learning any trade secrets as a result of their communications with Gaughan. Answer to Second Am. Compl. ¶ 13. Plaintiffs, in contrast, assert they disclosed all four parameters to defendants after the execution of the confidentiality agreement. Ex. 2 to Pls.' Opp'n (Gaughan Decl. ¶¶ 6, 11). To support this contention, plaintiffs provide an exhibit showing engineering calculations that were shown to defendants which disclose distance, angle and pressure parameters. Ex. 2A (Attach. to Gaughan Decl.) to Pls.' Opp'n. This exhibit, however, does not mention the temperature parameter. Therefore, there remains a genuine issue as to whether defendants learned the temperature parameter during their business relationship. Furthermore, even if defendants only learned distance, angle and pressure parameters, there is a genuine issue as to whether the combination of those three parameters alone warrants trade secret protection. Again, summary judgment is inappropriate when such material factual differences persist.

3. Unauthorized Disclosure of the Trade Secret

■ The third requirement of a trade secret misappropriation claim is a showing that the defendant used or disclosed the protected information. *See, e.g., Lemmon*, 559 N.W.2d at 279–80 (dismissing a trade secret claim in the absence of direct evidence showing defendant's use of protected information). Defendants deny disclosing the four parameters at the de-icing conference. Defs.' Mot. for Summ. J. at 5. Plaintiffs provide the transcript of the video shown at the de-icing conference which shows a disclosure of the angle, distance and pressure parameters. Ex. 2C to Pls.' Mot. for Summ. J. for Literal Infringement (Videotape Tr.). However, there remains a genuine issue as to whether Dempsey disclosed the temperature parameter in his oral presentation.

Because genuine issues of material fact exist with regard to secrecy, value, acquisition as part of a confidential relationship, and disclosure of the alleged trade secrets, defendants' motion for summary judgment on trade secret misappropriation and breach of contract [6] must be denied.

## C. Patent Infringement

The court uses "a two-step process" in analyzing patent infringement cases: first, the limitations of the claim are determined; and second, the accused product or process is measured against the properly interpreted claim. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed.Cir.2002). The first step, claim construction, is a matter of law and is "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *accord Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc). The second step, comparing the competing process to the construed claim, is a matter of fact for the jury. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1344 (Fed.Cir.2002).

### 1. Claim Construction

Patent claim construction must begin with the language of the claim. *Hockerson–Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 955 (Fed.Cir.2000); *see also Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed.Cir.2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves ...."); *SRI Int'l v.*

*Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed.Cir.1985) ("It is the *claims* that measure the invention."). Unless the inventor designated a special definition for a term in the specification, a claim term is to be given its "ordinary and accustomed" meaning. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed.Cir.1998); *accord York Prods. Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed.Cir.1996). In determining the ordinary meaning of a term, "[d]ictionaries are always available to the court" and are a preferred tool of construction because they are publicly available, "objective resources that serve as reliable sources of information on the established meanings" of terms. *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202–03 (Fed.Cir.2002); *accord Cybor*, 138 F.3d at 1459; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n. 6 (Fed.Cir.1996) ("[T]echnical treatises and dictionaries ... are worthy of special note. Judges are free to consult such resources at any time ....").

After the language of the claim itself and dictionaries or treatises, courts look to intrinsic evidence, *i.e.*, the patent specification (or description), the prosecution history (or file wrapper), and prior art cited in the prosecution history, to help interpret claims. The court first looks to the specification to "assist in resolving ambiguity." *Teleflex*, 299 F.3d at 1325; *see also Vitronics*, 90 F.3d at 1582 (stating that the specification "is the single best guide to the meaning of a disputed term"). Second, the prosecution history can help determine the meaning of claim terms by

---

6. Defendants' contention that the information is not secret for trade secrets purposes is their only argument for the breach of contract claim as well. The confidentiality agreement excludes coverage of information which "is part of the public knowledge or domain at the time of disclosure." Ex.1 to 2nd Am. Compl. (Confidentiality Agreement). Because defendants have failed to resolve genuine issues of material fact with regards to secrecy, summary judgment is inappropriate on the breach of contract claim as well.

eliminating interpretations that were "clearly and unambiguously" relinquished during the proceedings before the U.S. Patent & Trademark Office. *Middleton, Inc. v. Minn. Mining & Mfg. Co.*, 311 F.3d 1384, 1388 (Fed.Cir.2002). Lastly, extrinsic evidence (*e.g.*, expert testimony) may only be used as a last resort, where the meaning of the claim cannot be determined from intrinsic evidence alone. *Vitronics*, 90 F.3d at 1582.

#### a. Claim 25 of the '068 Patent

 Plaintiffs allege infringement of only claim 25 of the '068 patent. Claim 25 is a "method" or process claim which describes four steps:

(1) "providing a stationary apparatus through which the aircraft moves ...";

(2) "spraying a ... high-pressure ... air/fluid mixture ... onto selected surfaces of the aircraft ..." to de-ice the aircraft;

(3) "spraying a ... low-pressure ... glycol/water ... fluid mixture onto the deiced surfaces ..." to anti-ice [7] the aircraft; and

(4) "collecting the runoff ... fluid mixtures for subsequent recycling ...."

'068 patent, col. 38, ll. 18–39.[8]

#### b. The "One–Pass" Characteristic

 The distinguishing characteristic of claim 25 is the temporal relationship between steps (2) and (3): step (3) is started while step (2) is still being performed so that it lays "down an anti-icing coating ... as remaining portions of the aircraft surfaces are being de-iced ...." '068 patent, col. 38, ll. 33–35. In this way, the performance of steps (2) and (3) overlap temporally, allowing the aircraft to be "progressively de-iced and anti-iced in one pass of the aircraft relative to the apparatus." *Id.*, col. 38, ll. 37–39. Figures 4B–E of the '068 patent, reproduced below, illustrate this unique characteristic of claim 25.[9]

---

7. "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics*, 90 F.3d at 1582 (citation omitted). In the specification, "de-icing" is defined as the "removal of ice" from the wings and fuselage of an aircraft as required by the FAA prior to take-off. '068 patent, col. 1, l. 40. "Anti-icing" is defined as "preventing ice formation" on the wing and fuselage of the aircraft, usually achieved by spraying the aircraft with a light coating of anti-freeze fluid (*e.g.*, glycol/water mixture). *Id.* col. 1, l.41.

8. Claim 25 of the '068 patent provides in full: "The method of de-icing and anti-icing an aircraft comprising the steps of [1] providing a stationary apparatus through which the aircraft moves, the apparatus including respective nozzle means, [2] spraying a first relatively high-pressure first pressurized air/fluid mixture simultaneously and through the same nozzle means onto selected surfaces of the aircraft in a progressive sequence, such that successive portions of the aircraft surfaces are de-iced, and such that portions of the aircraft surfaces have respective adjacent surfaces which receive a spray pattern overlay, in sequence, so that the de-icing process is successively reinforced along the aircraft surfaces; and second [3] anti-icing the previously de-iced surfaces of the aircraft by spraying a relatively low-pressure second pressurized glycol/water eutectic fluid mixture onto the de-iced surfaces, thereby laying down an anti-icing coating thereon as remaining portions of the aircraft surfaces are being de-iced, and [4] collecting the run-off of the first and second fluid mixtures for subsequent recycling wherein the aircraft is progressively de-iced and anti-iced in one pass of the aircraft relative to the apparatus." '068 patent, col. 38, ll. 18–39.

9. While the court must be careful not to import limitations from the specification and drawings that are not in the words of the claim itself, *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed.Cir. 1998), figures can be helpful in an "explanatory or interpretative" capacity by clarifying or illustrating the limitations explicitly laid out in the claim language, *Payne Furnace & Supply, Co. v. Williams–Wallace Co.*, 117 F.2d

This figure is a side view of a wing as the nozzle mechanism passes over it. In the first panel, only step (2), high pressure de-icing, is being performed. In the middle two panels, both steps (2) and (3) are being performed: de-icing on the right part of the wing and anti-icing on the left part of the wing. The last panel shows the end of step (3), finishing anti-icing the wing.

The fact that the one-pass capabilities of claim 25 provide the important distinction over the prior art is illustrated by the prosecution history and comparisons with prior art. "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain

claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985). Furthermore, an "amendment to overcome a rejection" is a "clear disavowal of claim coverage" that shows "the intentional narrowing of a claim." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1321 (Fed.Cir.2003); *accord York Prods.*, 99 F.3d at 1575 (stating that a patent applicant "limits claims during prosecution" when he "alter[s] claim language to escape an examiner rejection"); *see also Genzyme Corp. v. Atrium Med. Corp.*, 212 F.Supp.2d 292, 327 (D.Del.2002) ("[W]hen an applicant disclaims coverage of a prior art device, a later claim construction should not give the patentee the benefit of a broad scope of coverage that includes the devices that

were expressly disclaimed in order to obtain the patent.").

Claim 25 was amended twice before finally being accepted. *See* Ex. 3 to Pls.' Mot. for Summ. J. on Non–Unenforceability ('068 File Wrapper at 195, 210). In order to cure the patentability problems of claim 25, patentee agreed on the telephone with the patent officer to add language to claim 25 indicating that "the aircraft will be de-iced and anti-iced in a two step single pass operation." *Id.* at 207. The prosecution history of the '068 patent shows that the examiner rejected the unamended version of claim 25 as anticipated by U.S. Patent No. 4,032,090 (issued June 28, 1977) ("Thornton–Trump patent"). *See* Ex. 3 to Pls.' Mot. for Summ. J. on Non–Unenforceability ('068 File Wrapper at 163).[10] The Thornton–Trump patent de-

---

823, 828 (9th Cir.1941). *See also Autogiro Co. of Am. v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 398 (1967) ("[D]rawings may be used in the same manner and with the same limitations as the specification."). Therefore, these figures may be used to explain the claim language: "progressively de-iced and anti-iced in one pass."

**10.** The exact language given by the patent examiner as a reason for rejection is as follows:

Claim 25 is rejected under 35 U.S.C. § 102(b) as being anticipated by Thornton–Trump.

Thornton–Trump discloses a method for de-ice [sic] an aircraft and if necessary, anti-icing an aircraft. A high pressure fluid is used to de-ice the aircraft. This could be done by using a hose and spraying in a circular pattern thus overlapping areas. A low pressure fluid is used for anti-icing the aircraft . . .

scribes a process of de-icing and anti-icing that occurs in two passes: the anti-icing is performed only after the de-icing has been completed. Ex. 3 to Pls.' Mot. for Summ. J. on Non–Unenforceability at 305 (Thornton–Trump patent, col. 5, ll. 41–56). Therefore, in order to avoid the prior-art process patented by Thornton–Trump, patent officer and patentee agreed to add language to show that for a portion of the process steps (2) and (3) occur simultaneously. *See* Ex. 3 to Pls.' Mot. for Summ. J. on Non–Unenforceability ('068 File Wrapper at 210). Thus, the claim language read together with the prosecution history and comparisons with prior art show the temporal relationship between steps (2) and (3) to be essential to the claim.

### c. *"Stationary"*

■ The term "stationary" in step (1) is not explicitly defined in the specification, and both parties submit several pages debating its meaning. When the patentee does not choose to act as his own lexicographer in the specification, a claim term is to be given its "ordinary and customary meaning." *Vitronics*, 90 F.3d at 1582.

### i. *Dictionary Definition of "Stationary"*

To determine the ordinary meaning of claim terms, the court may reference dictionaries. *Tex. Digital*, 308 F.3d at 1202. According to the Random House Dictionary of the English Language 1283 (College ed.1968), "stationary" means: "1. standing still; not moving. 2. having a fixed position; not movable." Plaintiffs contend both the first and the second definitions apply, asserting that "stationary" means "not movable." Under this interpretation, "stationary" would describe any sort of permanent de/anti-icing fixture at

an airport but would distinguish mobile units such as trucks in the Thornton–Trump patent. However, defendants argue only the first definition should apply, contending that "stationary" as "not moving" means fixed or with no moving parts. Under this narrower interpretation, the term "stationary" would only include fixed gantry systems and exclude permanent fixtures with moving parts, such as defendants' product.

When the ordinary meaning of a word comprises "two relevant alternatives," the term "may be construed to encompass both alternatives." *Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1379 (Fed.Cir.2002); *accord Tex. Digital*, 308 F.3d at 1203; *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed.Cir.2001) ("In addition, unless compelled to do otherwise, a court will give a claim term the full range of its ordinary meaning as understood by an artisan of ordinary skill."). Therefore, "stationary" as used in step (1) could comprise a fixed-location permanent installation with moving parts or without moving parts. However, before this interpretation is applied, the court must examine the intrinsic evidence to determine if it "clearly demonstrates" that only one of the definitions was intended. *Inverness*, 309 F.3d at 1379; *see, e.g., Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1380 (Fed.Cir.2004) (looking to intrinsic evidence to decide between two dictionary definitions for the claim term "prevent"); *see also Renishaw*, 158 F.3d at 1250 ("However, a common meaning, such as one expressed in a relevant dictionary, that flies in the face of the patent disclosure is undeserving of fealty.").

### ii. *"Stationary" in the Specification*

■ When a term has multiple dictionary definitions, the court must examine

Pls.' Mot. for Summ. J. on Non–Unenforceability, Ex. 3 at 163.

the intrinsic evidence to decide which of the possible dictionary definitions apply. *Tehrani v. Hamilton Med., Inc.*, 331 F.3d 1355, 1361 (Fed.Cir.2003); *accord Tex. Digital*, 308 F.3d at 1203 (holding that "the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor."); *cf. Renishaw*, 158 F.3d at 1249 (holding that when "a patent applicant has elected to be a lexicographer by providing an explicit definition in the specification for a claim term ... the definition selected by the patent applicant controls."). The word "stationary" appears in only one other place in the specification.[11] In that instance, the term "stationary" is used to reference a boom with articulating arms in contrast to a "truck-mounted boom." '068 patent, col. 17, ll. 29–30. The example from the specification uses the word "stationary" to describe something with moving parts (similar to the articulating boom of defendants' apparatus), thus supporting plaintiffs' definition which allows for moving parts. *See, e.g.,* Ex. 3 to Pls.' Opp'n (Dempsey Dep. at 15) (defendant's description of apparatus having articulating booms). In addition, contrasting the term "stationary" with the term "truck mounted" further supports plaintiffs' interpretation that a stationary apparatus is anything other than a mobile facility such as a deicing truck. The only explicit reference to the term "stationary"

in the specification supports a broad interpretation of the claim term.

To support their interpretation of "stationary," defendants point out "more than 100 references" in the specification to the fact that the aircraft travels through the apparatus.[12] Defs.' Reply at 15–16. However, "[r]eferences to a preferred embodiment, such as those often present in a specification, are not claim limitations." *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed.Cir.1988), *cited with approval in Inverness*, 309 F.3d at 1379; *accord Super Prods. Corp. v. D P Way Corp.*, 546 F.2d 748, 756 (7th Cir. 1976) ("While the language of the claim must be read in light of the specification and the file wrapper ... the claim alone is the measure of the invention.") (citations omitted); *see also 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed.Cir.2003) (noting that "a patentee need not describe all embodiments of his invention"); *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed.Cir. 1998) ("[A] court may not import limitations from the written description into the claims."); *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed.Cir.1994) ("[A]lthough the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments."). The specification describes one embodiment, a fixed gantry system, capa-

11. Column 17, lines 26 through 30 of the '068 patent state:

Examples of such pumps (for the high pressure de-icing (and/or cleaning) operations) are the high-pressure centrifugal type pumps commonly utilized in the chemical industry with stationary and/or truck mounted booms with multiple-section articulating arms.

12. Defendants also cite marketing materials that state Whisper Wash is a "drive-thru" apparatus. Defs.' Reply at 15–16. "In considering the claims of a patent, we are constrained to look at the claims in the patent and not the claims of advertising material designed for the purpose of selling a product." *Reese v. Elkhart Welding & Boiler Works, Inc.*, 447 F.2d 517, 523 (7th Cir.1971). Therefore, because the marketing materials are for advertising purposes, this court cannot consider them in construing the claim.

ble of performing the process described in claim 25. However, the disclosure of one embodiment does not import the limitations of that embodiment into the claim. *See Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'") (quoting *Teleflex*, 299 F.3d at 1327). Because the references in the specification pointed out by the defendants simply describe one particular embodiment, they do not limit claim 25 only to processes performed by fixed gantry systems.

### iii. Prosecution History Regarding "Stationary"

 In addition to the claim language and specification, the court may examine the prosecution history,[13] which is "often of critical significance in determining the meaning of the claims." *Vitronics*, 90 F.3d at 1582. "Where the patentee in the course of his application in the patent office has, by amendment, cancelled or surrendered claims, those which are allowed are to be read in the light of those abandoned and an abandoned claim cannot be revived and restored to the patent by reading it by construction into the claims which are allowed." *Schriber–Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 218, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132 (1940); *accord Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir.1995); *Standard Oil*, 774 F.2d at 452.

The file wrapper reveals that the added claim language "providing a stationary apparatus through which the aircraft moves, the apparatus including respective nozzle means" was added in an amendment directly before approval, at the same time as the "one pass" clause. Ex. 3 to Pls.' Mot. for Summ. J. on Non–Unenforceability ('068 File Wrapper at 210). Before the amendment, there was no apparatus requirement; therefore, the claim would have been construed to include processes effected by truck-mounted booms, fixed booms, fixed gantry systems or any effective apparatus. Defendants contend that in making the "stationary" amendment the patentee not only abandoned the truck-mounted means for effecting the process but that patentee also abandoned all fixed-installation articulating-boom means (including defendants' apparatus). However, there is nothing in the prosecution history to suggest that interpretation. In fact, examination of the prior art leads to the opposite conclusion.

"[T]he prior art cited in the file wrapper gives clues as to what the claims do not cover." *Autogiro*, 384 F.2d at 399. The patent office cited the Thornton–Trump patent both times as the reason for rejecting claim 25 without the "stationary" language. Ex. 3 to Pls.' Mot. for Summ. J. on Non–Unenforceability ('068 File Wrapper at 163, 203). Thornton–Trump provides a preferred embodiment of its process claims as being performed by trucks. *See* Ex. 3 to Pls.' Mot. for Summ. J. on Non–Unenforceability at (Thornton–Trump patent, col. 2, ll. 61–64) ("[I]t is contemplated that the operation be accomplished with a mobile vehicle . . . ."). This suggests that the "stationary" language was added by patentee to avoid the prior art of Thornton–Trump and therefore only the use of trucks or other mobile vehicles for achieving the method was abandoned by the

---

13. The prosecution history is "the complete record of all the proceedings before the Patent and Trademark Office, including any ex-

press representations made by the applicant regarding the scope of the claims." *Vitronics*, 90 F.3d at 1582.

amendment. *Compare id.* (Thornton–Trump patent, col. 2, ll. 64–68) ("An example of such a [mobile vehicle] unit ... comprises a *truck* having articulated booms ....") (emphasis added) *with* '068 patent, col. 7, l. 67 to col. 8, l. 1 ("[T]he present invention defines a *central location* at an airport for de-icing and anti-icing an aircraft just prior to the flight of the aircraft.") (emphasis added). Because the prosecution history supports the broader interpretation of the claim term "stationary," the interpretation that encompasses both alternate definitions, this court must reject defendants' overly narrow interpretation. Therefore, the court concludes that the claim term "stationary apparatus" describes any fixed-location installation for de/anti-icing an aircraft, containing either articulating booms or a fixed gantry.

### 2. Indirect Infringement

 Plaintiffs and defendants both move for summary judgment on the issue of infringement, both literal and wilful. Plaintiffs clarify in their opposition that they do not allege direct infringement [14] of claim 25 of the '068 patent by defendants; rather, they allege indirect infringement, *i.e.*, contributory infringement under 35 U.S.C. § 271(b) or inducement of infringement under 35 U.S.C. § 271(c). *See* Pls.' Opp'n at 13. A method claim is directly infringed "only by one practicing the patented method." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed.Cir.1993). Therefore, "although not direct infringement under 35 U.S.C. § 271(a)," activities associated with selling equipment may "constitute active inducement of infringement or contributory infringement ... under 35 U.S.C. § 271(b) and (c)." *Id.* Liability for inducement attaches under 35 U.S.C. § 271(b) to "[w]hoever actively induces infringement of a patent." The Federal Circuit interpreted the statute as such: "[a] person induces infringement under § 271(b) by actively and knowingly aiding and abetting another's direct infringement." *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 675 (Fed.Cir.1990) (citation and emphasis omitted). Furthermore, a person can be held liable for contributory infringement under § 271(c) when she "offers to sell or sells within the United States ... a material or apparatus for use in practicing a patented process" when that material or apparatus:

(1) "constitut[es] a material part of the invention";

(2) "[is] know[n] by [such person] to be especially made or especially adapted for use in an infringement of such patent"; and

(3) "[is] not a staple article or commodity of commerce suitable for substantial non-infringing use ...."

35 U.S.C. § 271(c). [15]

### a. No Indirect Infringement Without Direct Infringement

 It is well settled that "[a]bsent direct infringement of the patent claims,

---

**14.** "Direct infringement" only refers to infringement under 35 U.S.C. § 271(a). *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed.Cir.1993). § 271(a) provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention ... infringes the patent."

**15.** 35 U.S.C. § 271(c) provides in full:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such

there can be neither contributory infringement ... nor inducement of infringement." *Met–Coil Sys. Corp. v. Korners Unltd., Inc.*, 803 F.2d 684, 687 (Fed.Cir.1986) (citations omitted); *accord Joy Techs.*, 6 F.3d at 774 (contributory infringement and inducement); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) (contributory infringement); *Nationwide Chem. Corp. v. Wright*, 458 F.Supp. 828, 839–40 (M.D.Fla.1976) (inducement), *aff'd*, 584 F.2d 714 (5th Cir.1978); *see, e.g., Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1277 (Fed.Cir.2004) (holding that summary judgment of non-infringement is warranted because the plaintiff's "failure to prove direct infringement ... necessarily dooms its allegations of indirect infringement"). Because for both inducement and contributory infringement the product must be capable of use in an infringing process, if the material or apparatus cannot be used to practice a patented process, there can be no inducement or contributory infringement. Thus, failure to show direct infringement by some third party is fatal to any claims of indirect infringement.

### b. *Defendant's Product is Incapable of Infringing*

■ The evidence shows that the product sold to the Philadelphia airport by defendants is incapable of infringing use. Plaintiffs claim that defendants sold their product to the Philadelphia Airport where it is being operated in a manner which infringes claim 25 of the '068 patent. Pls.' Opp'n at 14. Defendants' product "consists of two maneuverable nozzles attached to the nose of an operator-controlled, rotating cab mounted at the end of ... a rotating, telescopic and vertically-articulat-

ing boom." Defs.' Reply at 14; *see also* Exs. 3A, 3B, & 4 to Pls.' Opp'n (diagrams and photographs of defendants' product). The system sold to the Philadelphia airport consists of two booms, one for each side of the aircraft. Ex. 3 to Pls.' Reply (Dempsey Dep. at 109–10). A preferred mode of operation of defendants' product is described in the deposition of William Dempsey. Ex. 2A to Pls.' Mot. for Summ. J. on Literal Infringement (Dempsey Dep. at 37–38). The operator, in the enclosed cab at the end of the boom, traverses the plane, usually from nose to tail, performing the de-icing. *Id.* The lower nozzle provides forced air and the upper nozzle provides fluid. Ex. 3 to Pls.' Opp'n (Dempsey Dep. at 97–98). The two nozzles together can deliver only one stream of air/fluid mixture at a time; the operator has the ability to choose either the de-icing fluid or the anti-icing fluid from within the enclosed cab. Ex. 2A to Pls.' Mot. for Summ. J. on Literal Infringement (Dempsey Dep. at 37–38). Therefore, the apparatus can perform anti-icing on a section only after de-icing is complete and the cab is incapable of spraying high pressure de-icing fluid and low-pressure anti-icing fluid at the same time.

■ Claim 25 of the '068 patent requires that step (2), high-pressure de-icing, and step (3), low-pressure anti-icing, overlap temporally so that for a portion of the process both streams are being sprayed at the same time, *see supra* p. 16. Defendants' product is unable to spray both streams at the same and is thus incapable of infringing the '068 patent. Because the alleged contributory infringement is the sale of a product which is incapable of infringing, there can be no liability for contributory infringement under 35 U.S.C.

patent, and not a staple article or commodity of commerce suitable for substantial non-

infringing use, shall be liable as a contributory infringer.

§ 271(c).[16] Moreover, the only activities plaintiffs rely upon to support their claim of inducement relate to the sale, training or instructions given to the Philadelphia airport regarding defendants' product. Pls.' Opp'n at 14–16; Pls.' Mot. for Summ. J. on Literal Infringement at 8. However, because there is no way to operate defendants' product in an infringing manner, defendants cannot have provided any instruction or training on how to infringe plaintiffs' patent. Because the activities alleged to be inducement relate to a product incapable of infringing, no set of alleged facts could support liability for inducement under 35 U.S.C. § 271(b). There is no genuine issue related to any facts material to the claims of literal or willful infringement; therefore, plaintiffs' motion for summary judgement on literal infringement must be denied and defendants' motion for summary judgment on this claim must be granted.[17]

### D. Defamation and Unfair Competition

Gaughan and Whisper Wash move for summary judgment on the defamation and unfair competition claims originally brought against them in North Carolina. These claims are based on a press release Gaughan circulated to industry representatives at the 11th Annual Aircraft and Airfield Deicing Conference and Exposition in Washington, D.C., but which was not disseminated to any media outlet. *See* Global Compl. ¶¶ 9–10; Catalyst Answer ¶¶ 9–10. The contents of the press release describe the allegations plaintiffs made in their original complaint in this court for breach of contract, misappropriation of trade secret and violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"). *See* Ex. B to Global Compl. Global and Air T allege that the contents of the press release are defamatory and Gaughan's actions in producing and distributing it constitute unfair and deceptive trade practices under North Carolina General Statute § 75–1.1.[18]

The parties do not discuss whether the language of the press release is defamatory, but instead focus their argument on whether the common interest privilege applies. The court will assume *arguendo*

16. Furthermore, where equipment is "capable of substantial non-infringing uses[,] sale of such equipment to the general public does not constitute contributory infringement ...." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). All uses of defendants' product are non-infringing; *a fortiori*, defendants' product is "suitable for substantial non-infringing use," 35 U.S.C. § 271(c), and therefore sale of such product cannot constitute contributory infringement.

17. Because there can be no willful infringement absent a finding of literal infringement, plaintiffs' motion for summary judgment on willful infringement must be denied and defendants' motion for summary judgment on willful infringement must be granted.

18. Plaintiffs move for summary judgment to dismiss the unfair competition claim, but provide no support for this motion in either their memorandum in support or reply, which address only the defamation claim. *See* Pls.' Mot. for Summ. J. on Defamation and Unfair Competition; Pls.' Reply at 13. Because the parties' briefing inadequately addresses the unfair competition claim, the court will not decide the matter here. *See* LCvR 7(a) (requiring that all motions be accompanied by "a statement of the specific points of law and authority that support the motion"); *Arizona v. Shalala*, 121 F.Supp.2d 40, 46 n. 4 (D.D.C. 2000) (refusing to address an argument because the argument was not supported by authority, as required by LCvR 7); *United States v. Wade*, 992 F.Supp. 6, 21 (D.D.C. 1997) (refusing to address an argument, briefly raised, but for which "absolutely no legal, factual, or rhetorical support" was offered); *cf. S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 613–14 (D.C.Cir.2000) (refusing to address an " 'asserted but unanalyzed' argument") (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983)).

that the contents of plaintiffs' press release are defamatory in order to decide the merits of the privilege issue.

■ The common interest privilege is a qualified privilege that "exists when the publisher of a defamatory statement and the person to whom it is made have a common interest, and the communication is of a kind reasonably calculated to protect or further it." *Roland v. D'Arazien*, 685 F.2d 653, 655 (D.C.Cir.1982). The common interest privilege protects statements that are "(1) made in good faith, (2) on a subject in which the party communicating has an interest ... (3) to a person who has such a corresponding interest." *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C.1990). It is a question of law for the court to determine whether a communication is privileged when the facts surrounding its publication are undisputed. *Roland*, 685 F.2d at 655. The issue of whether a party abused the privilege by acting with malice, recklessness, or dishonesty is a question of fact for the jury. *Id.*

■ Global and Air T argue that the common interest privilege does not apply because the parties to whom Gaughan circulated the press release did not share a common interest in the subject matter with Gaughan. Plaintiffs have not specifically articulated any common interest shared by Gaughan and the industry representatives present at the 11th Annual Aircraft and Airfield Deicing Conference and Exposition. Plaintiffs merely assert that the common interest in this case is indistinguishable from the common interests in *Audain v. American University*, 1997 U.S. Dist. LEXIS 21730 (D.D.C. 1997), and *Roland*, 685 F.2d 653. In *Audain*, the court held that the common interest privilege applied to the circulation of a complaint, alleging breach of contract and discrimination in faculty hiring, to pro-

spective employers and to faculty members who were serving as references. *Id.* at *5. The court found that law schools contemplating a prospective hire would want to know the circumstances under which he left his former place of employment. *Id.* In *Roland*, the court held that a common interest in the smooth and efficient operation of a congressman's office privileged a staffer who informed the office's staff director about the facts underlying a conflict with a colleague, who was later terminated on the basis of that information. 685 F.2d at 655.

It is unclear what common interest industry representatives may have had with Gaughan and Whisper Wash that would warrant the disclosure of information about the lawsuit against Global and Air T. Perhaps industry representatives have an interest in knowing the status of litigation involving Gaughan and Whisper Wash and Global and Air T, but the claims alleged in the complaint for breach of contract, trade secret misappropriation and violations of RICO do not directly concern the new deicing technology. Further, because the technology in the '068 patent was never implemented such that plaintiffs would actually have prospective customers, the industry representatives at the conference would not be in a position similar to the law schools in *Audain* who were considering hiring Audain or the staff director in *Roland* as potential purchasers of the new technology. Accordingly, taking all inferences in favor of the non-moving party, because Gaughan and Whisper Wash have not resolved the material issues of fact regarding the application of the common interest privilege, plaintiffs' motion for summary judgment on the defamation claim must be denied.

**E. Standing**

■ Finally, defendants contend that plaintiffs Catalyst and Whisper Wash

should be dismissed from this action because they lack standing to sue, thus depriving the court of subject matter jurisdiction over their claims. Plaintiffs have asserted that both Catalyst and Whisper Wash are "duly incorporated under the laws of the state of Maryland." Second Am. Compl. ¶¶ 1, 3. Defendants note that Catalyst no longer exists as a Maryland corporation, since its charter was forfeited in 1996, and that Whisper Wash is not incorporated in the state of Maryland at all. A federal district court exercising diversity jurisdiction must look to state law to determine a party's standing to sue. *Hoffman v. Jeffords,* 175 F.Supp.2d 49, 54 n. 2 (D.D.C.2001) (citation omitted). In the case of Catalyst, under Maryland law, a corporation whose charter is forfeited no longer has a legal existence, and its "power to sue and be sued ... is extinguished." *Atl. Mill & Lumber Realty Co. v. Keefer,* 179 Md. 496, 20 A.2d 178, 180 (1941) (citations omitted). Simply put, forfeiture ends a corporation's existence, legal and otherwise. *Cloverfields Imp. Ass'n, Inc. v. Seabreeze Props.,* 32 Md.App. 421, 362 A.2d 675, 679 (1976), *aff'd,* 280 Md. 382, 373 A.2d 935, *modified,* 280 Md. 382, 374 A.2d 906 (1977) (citation omitted). Here, defendants assert, and plaintiffs do not deny, that Catalyst's corporate charter was forfeited in 1996. Exh. A to Defs.' Mot. to Dismiss. Under the facts presented and the applicable law, Catalyst lacks standing to maintain this action.

Defendants also petition the court to dismiss Whisper Wash, on the grounds that contrary to plaintiffs' repeated averments in pleadings filed with this court, *see* Pls.' Mot. to Add Whisper Wash as a Party, it is not incorporated in the state of Maryland. Plaintiffs now concede this assertion, and instead muse that both Whisper Wash and Catalyst would qualify as "unincorporated associations" under FED. R. CIV. P. 17(b). This possibility, however, will not support those plaintiffs' continued participation in these proceedings, since 17(b) provides standing for a party "enforcing a substantive right ... existing under the Constitution or laws of the United States." The only such rights at issue in the instant case are plaintiffs' patent infringement claims, which fail for the reasons discussed *supra* pp. 18–20.

Finally, while Maryland law [19] provides an opportunity for unincorporated associations to sue and be sued,[20] this provision cannot be read to expand the kind of entities so entitled to include amorphous groups that have their own name but no distinct identity. *Bourexis v. Carroll County Narcotics Task Force,* 96 Md. App. 459, 625 A.2d 391, 396 (1993). Furthermore, an unincorporated association has no standing to sue when it has no property interest of its own that is separate and distinct from its individual members. *Carroll Park Manor Cmty. Ass'n, Inc. v. Board of County Comm'rs,* 50 Md. App. 319, 437 A.2d 689, 693 (1981). Plaintiffs have made no showing that Whisper Wash has any distinct assets or other characteristics that would allow it to be properly designated as an entity separate from Catalyst or from Gaughan, the sole officer and director (and at least 90% owner) of both "companies." See Pls.' Mot. to Add Whisper Wash as a Party at 3. Ac-

---

19. Arguably, since Whisper Wash is not incorporated in Maryland after all, it is District of Columbia law that should apply to determine Whisper Wash's standing in this case. The result is the same. In fact, D.C. law is even less obliging—unincorporated associations may not sue or be sued in their own names. *Pritchett v. Stillwell,* 604 A.2d 886, 889 (D.C. 1992).

20. Md. Courts and Judicial Proceedings Code Ann. § 6–406.

cordingly, Whisper Wash also lacks standing to sue, and along with Catalyst it must be dismissed from this action.

## III. CONCLUSION

For the foregoing reasons, the court concludes that plaintiffs' motions for summary judgment must be denied, defendants' motion for summary judgment must be granted in part and denied in part, and defendants' motion to dismiss must be granted. An appropriate order accompanies this opinion.

## ORDER

For the reasons stated in the court's memorandum opinion docketed this same day, it is this 14th day of December, 2004, hereby

**ORDERED**, that plaintiffs' motions for summary judgment are **DENIED**; and it is further

**ORDERED**, that defendants' motion for summary judgment is **GRANTED** as to the patent infringement claim and **DENIED** as to the misappropriation of trade secret and breach of contract claims; and it further

**ORDERED**, that defendants' motion to dismiss plaintiffs Catalyst and Whisper Wash is **GRANTED**.